UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JORDAN'S LADDER LEGAL PLACEMENTS, LLC,

                                    *Plaintiff*,

                    -against-

MAJOR, LINDSEY & AFRICA, LLC,

                                    *Defendant.*

No. 21 Civ. 7124

**COMPLAINT**

**JURY DEMAND**

For its Complaint, Plaintiff Jordan's Ladder Legal Placements, LLC ("Plaintiff" or "Jordan's Ladder"), by its attorneys, the Law Office of Daniel F. Wachtell, complaining of Defendant Major, Lindsey, & Africa, LLC ("MLA"), alleges as follows:

**INTRODUCTION**

1.      This case is a straightforward dispute between two legal recruiters.  The first, Melissa Jordan of Jordan's Ladder, worked diligently over the course of more than a year to identify a valuable and mutually beneficial opportunity for a senior law firm partner – and, potentially, other members of his practice group – to make a lateral transfer from one firm to another.   Jordan's efforts successfully laid the groundwork for two partners to move to the new law firm in early 2021.

2.      By contrast, the second recruiter – Lawrence Mullman of MLA – did nothing of the sort.  Instead, he swooped in after Jordan's many months of work, once both of the partners had already interviewed with their new firm, and – based on nothing more than his preexisting relationship with one of the partners – staked a baseless claim on behalf of MLA to the $375,000 placement fee contractually due from the new firm to Plaintiff for the partner's lateral move.

This supposed claim willfully ignored that neither MLA nor Mullman had timely presented that partner as a candidate, and moreover that neither had done any work to further the placement.

3.      Then, when Jordan refused to capitulate to Mullman's demand that she waive Plaintiff's contractual rights to the fee, Mullman threatened – in a recorded telephone conversation with Jordan – to take *both* candidates to a *different* firm than the one where Plaintiff had presented them, thereby leaving Plaintiff, in Mullman's words, with nothing.

4.      Under the terms of Plaintiff's written contract with the hiring law firm – as MLA is (and, at all relevant times, was) aware – only the first search firm to present a candidate is eligible to be paid a placement fee.  Further, the agreement provides that if two search firms stake a claim to the placement fee, the search firms must negotiate between themselves "an agreement as to the percentage (if any) to be paid to each search firm".

5.      The law firm, having been informed by each of Plaintiff and MLA that they claim the placement fee, has placed the fee in a trust account rather than paying it to Plaintiff, even though Plaintiff is contractually and equitably entitled to the fee based on the terms of its written agreement with the law firm and Jordan's diligence in undertaking to present and further the candidacy of both lateral partners with their knowledge and authorization.

6.      By contrast, MLA has no legal or equitable basis to claim the fee; as best can be determined, the sum total of its position is that because the lateral partner belatedly decided that he wanted Mullman (rather than Jordan) to be considered his recruiter, that should supersede Plaintiff's contractual right to receive the fee.

7.      This is therefore a textbook case of tortious interference.  MLA knew that Plaintiff has and had a contractual agreement with the law firm entitling Plaintiff to the fee, yet MLA, acting through its agent Mullman and others, wrongfully staked a claim to the fee and,

upon information and belief, continues to maintain such claim.  MLA's conduct has thereby deprived Plaintiff of the fee, and Plaintiff has been damaged in the amount of the fee, plus interest, together with costs that it has incurred in attempting to recoup the fee, including legal expenses.

8.      Plaintiff thus brings the action seeking (1) a declaratory judgment that it, and not MLA, is entitled to the entire placement fee in question; and (2) damages for tortious interference with contract against MLA.

## PARTIES

9.      Plaintiff Jordan's Ladder Legal Placements, LLC is a New York limited liability company.  Its principal, non-party Melissa Jordan, is a resident of New York County.  Jordan, an attorney, has worked for nearly ten years as a legal recruiter, specializing in high-end lateral partner placements at major law firms.

10.     Defendant Major, Lindsey & Africa, LLC is, upon information and belief, a Maryland limited liability company with its principal place of business in Maryland.  MLA, which has more than 30 offices worldwide, transacts business on a regular and continual basis in the State of New York, maintaining an office in New York County at 521 Fifth Avenue, 5th Floor, New York, New York 10175.

## RELEVANT NON-PARTIES

11.     Non-party Lawrence N. Mullman is a legal recruiter and a partner in MLA's office in New York, New York.

12.     Non-party Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") is an international law firm with twenty locations worldwide.

13.     Non-party William M. Bosch, Esq., is a partner in Pillsbury's commercial litigation group, based primarily in Washington, D.C.  He joined Pillsbury on or about April 30, 2021.

14.     Non-party James M. Catterson, Esq., is a partner in Pillsbury's commercial litigation group, based primarily in New York, New York.  He joined Pillsbury on or about May 3, 2021.

## JURISDICTION AND VENUE

15.     This Court has original jurisdiction of this civil action pursuant to 28 U.S.C. § 1332(a) (diversity) because Plaintiff and MLA are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

16.     An actual controversy exists between Plaintiff and MLA that is of sufficient immediacy and reality to warrant declaratory relief.

17.     This Court has personal jurisdiction over Defendant MLA pursuant to New York's long-arm statute, CPLR § 302(a)(3), because the facts underlying the Complaint arise out of MLA's alleged actions (and the actions of its agents) in New York state.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, both because one or more parties is a resident of New York County and because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this judicial district.

## STATEMENT OF FACTS

### A.  Plaintiff Identifies Pillsbury as a Lateral Opportunity for Bosch

19.     Jordan organized Plaintiff as a limited liability company on August 15, 2019.

20.     Beginning in or around September 2019, Bosch began to discuss with Jordan possible opportunities for Bosch to make a lateral move away from the firm at which he was a

partner at that time.  Bosch also informed Jordan that other members of that firm's litigation group – of which he was the chair – might seek to move to a new firm with him.

21.     Jordan worked diligently on Bosch's behalf to identify suitable firms, particularly those that might be looking to hire partners with Bosch's expertise in commercial litigation and specialty in real estate litigation.  For instance, relying on her expertise as a legal recruiter, Jordan compiled a detailed spreadsheet and comprehensive analysis of the pros and cons of potential lateral moves to more than three dozen law firms, and she emailed the same to Bosch in January 2020.

22.     Bosch expressed his gratitude for Jordan's efforts and together they identified Pillsbury, in January 2020, as the firm that appeared to be the best fit.  Jordan reached out to Pillsbury to inform them that she had an unnamed candidate to present to the firm.

**B. Plaintiff's Fee Agreement with Pillsbury**

23.     On January 24, 2020, Jordan signed Pillsbury's standard Attorney Search Firm Agreement (the "Fee Agreement"), which is annexed to this Complaint as Exhibit A.  The Fee Agreement was executed by Jordan, on behalf of Plaintiff, and by Charles L. Curtis, on behalf of Pillsbury.  The Fee Agreement refers to Plaintiff as "Search Firm" in all relevant paragraphs, and refers to Pillsbury and Search Firm, collectively, as the "Parties".

24.     In relevant part, the Fee Agreement includes the following provisions:

a.  Section 1(b) provides that "If a candidate presented by Search Firm is admitted as a partner of Pillsbury under circumstances that entitle Search Firm to receive compensation pursuant to this Agreement, Pillsbury will pay Search Firm a fee equal to twenty-five percent (25%) of the candidate's annual base compensation or

estimated annual base profit participation (whichever is applicable) as of the date the candidate becomes a member of the Firm."

b.  Section 1(d) provides that "If Search Firm refers more than one candidate from the same law firm, agency or other organization as a 'group' or 'package,' the fee shall be the amount equal to twenty-five percent (25%) of the annual base compensation or estimated annual base profit participation (whichever is applicable) of the two (2) most highly compensated attorneys of the group hired."

c.  Section 1(e) provides that "Fees are payable within thirty (30) days of Pillsbury's receipt of invoice from Search Firm."

d.  Section 2 provides that "If Pillsbury receives a candidate's resume from more than one source, the resume which was received first, regardless of which Pillsbury office received the resume, will be deemed to be the first resume received by Pillsbury, and only that source will be eligible for a placement fee (if applicable).  Pillsbury will deem that resume to be the exclusive referral of Search Firm for six months from initial receipt of the resume (or for six months after the candidate's last interview with Pillsbury, whichever is later)."

e.  Section 2 also provides that "Every candidate, including each member of a 'group' or 'package', must have his/her express permission, preferably in writing, to Search Firm to submit his/her resume and any other information to Pillsbury."

f.  Section 2 further provides that "In the event that more than one search firm claims the right to a placement fee for placement of a particular candidate or candidates . . . it will be the obligation of Search Firm to negotiate directly with any other search firm claiming a right to payment of a placement fee and to reach an agreement as to the

percentage (if any) to be paid to each search firm, not to exceed in aggregate the

placement fees described in paragraph 1 above."

25.     Upon information and belief, the Fee Agreement is a boilerplate document

commonly used by Pillsbury in its relationships with legal recruiters.

26.     Upon information and belief, if there exists a fee agreement between Pillsbury

and MLA, it would be substantively identical to the Fee Agreement between Pillsbury and

Plaintiff.

**C. Jordan Introduces Bosch to Pillsbury Prior to the Coronavirus Pandemic**

27.     On January 29, 2020, Jordan shared Bosch's name with Pillsbury and informed

the firm that because Bosch was in a leadership role he might bring other partners with him if he

were to move.

28.     On February 5, 2020, Bosch had an initial phone interview with a partner at

Pillsbury, and on February 24 and 25, 2020, Bosch interviewed with additional Pillsbury

partners.  As is standard in the industry, these interviews were scheduled with Pillsbury by the

legal recruiter – *i.e.*, Plaintiff – on behalf of the candidate – *i.e.*, Bosch.  Based on feedback that

Jordan obtained, Pillsbury was excited about pursuing the opportunity with Bosch, as was Bosch

with Pillsbury.

29.     Shortly thereafter, however, the coronavirus pandemic intervened, and – although

Jordan maintained communication with Pillsbury about Bosch throughout the subsequent months

– Plaintiff did not have further substantive contact with Pillsbury regarding Bosch's candidacy

until December 2020.

**D.  Jordan Presents Both Bosch and Catterson to Pillsbury**

30.     Following the delay occasioned by the coronavirus pandemic, Jordan again engaged with Pillsbury in substantive discussions regarding Bosch's lateral candidacy beginning in December 2020.

31.     To wit, on or about December 16, 2020, Jordan contacted Pillsbury's internal recruiting team in order to facilitate a conversation between Bosch and Deborah Baum, the head of Pillsbury's global litigation practice.  On or about January 5, 2021, Jordan was informed by email that Pillsbury remained interested in Bosch's candidacy.

32.     On or about January 12, 2021, Bosch spoke with Baum.  That same day, Bosch expressed to Jordan that the discussion with Baum had gone well, and informed Jordan that he had broached with Baum the possibility of bringing a colleague along with him to Pillsbury – namely Catterson.  Bosch specifically asked Jordan not to reach out to Catterson until Bosch had confirmed both Catterson's interest in Pillsbury as well as Catterson's willingness to speak with Jordan specifically.

33.     Later that day, Jordan emailed Bosch to request that Bosch pass her contact information to Catterson if and only if Catterson wanted to discuss the Pillsbury opportunity with her.  Importantly, because Jordan did not want to interfere if Catterson was working with another recruiter, and understood that Bosch did not want to interfere either, Jordan – consistent with both Bosch's request and industry custom – did not reach out directly to Catterson.

34.     The following day, Bosch emailed Jordan to inform her of Catterson's availability for a meeting with Pillsbury, which he asked her to arrange.  Jordan understood from this and subsequent communications with Bosch that Catterson had expressly authorized her – rather than another recruiter – to submit information to Pillsbury in support of his candidacy.

35.     On this basis, Jordan proceeded to exchange numerous emails over the next week with Pillsbury and Bosch, through which she arranged an initial meeting between Catterson and Pillsbury, for January 25, 2021, which Bosch was scheduled to join.

36.     During these communications, Pillsbury asked Jordan to pass along confidentiality forms to Catterson.  Jordan forwarded the forms to Bosch, who at the time was acting as an intermediary between herself and Catterson, as attachments to an email dated January 21, 2021.

37.     The following day, *i.e.*, January 22, 2021, Bosch returned the forms – which appeared to have been completed and signed by Catterson – to Jordan, who forwarded them to Pillsbury.

38.     On January 25, 2021, as Jordan had arranged, Bosch and Catterson together met with Pillsbury.  Later that day, Jordan spoke to Bosch, who provided her with feedback on the meeting on behalf of himself and Catterson.  During that call, Bosch indicated that Catterson did not need to speak with Jordan at that time but would reach out if any questions arose.  Bosch specifically confirmed, during the January 25 call with Jordan, that Catterson knew to reach out to Jordan if he had any questions about Pillsbury.

39.     The following day, *i.e.*, January 26, 2021, Pillsbury sent Jordan Lateral Partner Questionnaire (LPQ) forms for completion by Bosch and Catterson.  Jordan forwarded both forms to Bosch, who, upon information and belief, forwarded the LPQ form to Catterson.

40.     Jordan understood at this point, on the basis of her communications with Bosch regarding Catterson, both that Catterson was interested in pursuing a move to Pillsbury and was aware of and had approved her representation of his candidacy.

41.     Furthermore, by communicating with Jordan regarding Catterson, Pillsbury treated Plaintiff as the recruiter of record for Catterson for (at a minimum) the entire period from January 13, 2021 to January 26, 2021, during which time Jordan had (a) arranged an initial interview for Catterson; (b) coordinated Catterson's submission of necessary confidentiality agreements concerning his candidacy; and (c) requested Catterson's submission of the LPQ form.

42.     At that point, there was <u>no</u> additional work to be done by Plaintiff to present Catterson as a candidate to Pillsbury, as contemplated by Section 2 ("Presentation of Candidates") of the Fee Agreement.  Specifically, according to standard industry practice, for partners of the seniority of Bosch or Catterson (who, prior to having become a law firm partner of Bosch's, was a justice of the Appellate Division of the New York Supreme Court, First Department) to make a lateral move, there is absolutely no need (or expectation) for a search firm to present a candidate's resume, referrals, or other supporting materials, as there would be for a more junior partner or associate candidate.  A partner-level candidate is considered to be presented, and to be exclusively presented by a specific recruiter, when that recruiter gives the individual's name to the law firm with the individual's authorization.  And, for any candidate – irrespective of seniority – that candidate would indisputably be deemed to have been presented once they actually met with the new law firm.

43.     Under the exclusivity provision of Section 2 of the Fee Agreement, "[i]f Pillsbury receives a candidate's resume from more than one source, the resume which was received first, regardless of which Pillsbury office received the resume, will be deemed to be the first resume received by Pillsbury, and <u>only that source will be eligible</u> for a placement fee (if applicable)" (emphasis added).  Additionally, "Pillsbury will deem that resume to be <u>the exclusive referral of</u>

<u>Search Firm for six months</u> from initial receipt of the resume" (emphasis added).  Accordingly, only Plaintiff could be eligible to receive the placement fee for Catterson, who began his employment at Pillsbury less than six months after Plaintiff formally presented him to the firm in January 2021.

### E.  MLA Tortiously Interferes with Plaintiff's Contract with Pillsbury

44.   On January 27, 2021, Catterson contacted Jordan by telephone.  During their call, Catterson informed Jordan that he was represented by Mullman, of MLA.  Jordan responded that this was inconsistent with the fact that Catterson had already interviewed with Pillsbury, a meeting that Jordan had coordinated via Bosch with Catterson's permission.

45.   Later that day, Jordan spoke with Bosch.  During their call, Bosch asked her to consider splitting the Catterson Placement Fee with MLA.  Jordan explained why the Catterson Placement Fee was due to her firm, and not to MLA, but said she would consider Bosch's request as a professional courtesy.  In a subsequent email to Bosch that evening, Jordan offered to speak to Mullman about the fee.

46.   On January 29, 2021, Pillsbury's Baum contacted Jordan.  In a telephone call, Baum stated that Pillsbury intended to pay the Catterson Placement Fee to MLA and suggested that Plaintiff could work out a potential split of the fee with MLA after the fact.  Baum said that Pillsbury would be willing to strongly encourage MLA to split the fee with Plaintiff.  During the call, Jordan communicated to Baum that paying the fee to MLA would directly contravene the terms of the Fee Agreement.  She reiterated to Baum, however, the offer she had previously made to Bosch, *i.e.* that she would be willing to speak to Mullman concerning the fee that was due to Plaintiff.

**F.  Mullman Threatens to Leave Plaintiff "With Nothing"**

47.     On February 2, 2021, Jordan received a voicemail message from Mullman saying that Baum had asked him to reach out to her.

48.     The next day, Jordan spoke with Mullman.  During the telephone call, which Jordan recorded in order to memorialize the conversation:

- Mullman said that he was representing Catterson in connection with the Pillsbury opportunity and demanded 100% of the Catterson Placement Fee on behalf of MLA.

- Jordan responded that this demand was unreasonable and unsupported by the facts, particularly since she had already presented Catterson to Pillsbury as a candidate.

- Jordan maintained that Plaintiff would keep the entire Bosch Placement Fee, as was its right, but that – even though Plaintiff was also entitled to the entirety of the Catterson Placement Fee under its Fee Agreement with Pillsbury – she was willing to engage in a reasonable discussion with Mullman about MLA receiving a portion of the Catterson Placement Fee in the interest of compromise.

- Mullman said that neither he nor Pillsbury would ever permit Plaintiff to keep the entire Bosch Placement Fee while also receiving a portion of the Catterson Placement Fee.  He threatened Jordan that, if she persisted in seeking both fees, Catterson and Bosch "will go elsewhere rather than see that happen and you'll end up with nothing" (emphasis added).

**G.  MLA's Tortious Acts Damage Plaintiff**

49.     In or around April 2021, Jordan learned, via a telephone call with Pillsbury, that Bosch and Catterson would be joining Pillsbury as partners on April 30 and May 3, 2021,

respectively.  She further learned that Pillsbury would be paying a placement fee of $375,000 for each candidate.

50.     On or about May 3, 2021, Plaintiff submitted to Pillsbury an invoice for $375,000 for the fee for the placement of Bosch and an invoice for $375,000 for the fee for the placement of Catterson.

51.     As is standard in the legal recruiting business, and consistent with the terms of the Fee Agreement, Plaintiff's invoices specified that payment of each of the placement fees was due within 30 days, *i.e.*, by June 2, 2021.

52.     By email dated June 16, 2021, Charles Curtis, on behalf of Pillsbury, informed counsel for Plaintiff that he had "been authorized to process a payment to [Plaintiff] in the amount of $375,000 for the placement of Bill Bosch."  Plaintiff received that payment on or about June 18, 2021.

53.     In the same June 16 email, Curtis further informed counsel for Plaintiff that Pillsbury would be "holding the fee on James Catterson in a trust account pending notification from both parties that the dispute between MLA and [Plaintiff] has been resolved."

54.     To date, Plaintiff has not received payment of the Catterson Placement Fee.

## FIRST CLAIM FOR RELIEF
(Declaratory Judgment)

55.     Plaintiff repeats and realleges Paragraphs 1 through 53, as if set forth fully herein.

56.     Plaintiff entered into the Fee Agreement with Pillsbury on January 24, 2020.

57.     In compliance with all applicable terms of the Fee Agreement, Plaintiff thereafter presented Catterson as a candidate to Pillsbury.

58.     Catterson provided his express permission to Plaintiff to submit him as a candidate to Pillsbury through acts that included – directly or through Bosch – agreeing to have

Plaintiff arrange an interview for him; providing his availability to Plaintiff for said interview; providing his completed confidentiality form to Plaintiff; and, ultimately, attending the interview with Pillsbury that Plaintiff had arranged.

59.     Plaintiff, and not MLA, was the first firm to present Catterson to Pillsbury as a candidate.

60.     Pursuant to the Fee Agreement, Plaintiff, and not MLA, is therefore entitled to receive the entirety of the Catterson Placement Fee.

61.     Upon information and belief, Pillsbury has placed the Catterson Placement Fee in trust pending notification from both parties that the dispute between MLA and Plaintiff has been resolved.

62.     As a result of the facts described in the foregoing paragraphs, this Court is presented with a substantial controversy of sufficient immediacy and reality to warrant the exercise of its equitable powers.

## SECOND CLAIM FOR RELIEF
(Tortious Interference with Contract)

63.     Plaintiff repeats and realleges Paragraphs 1 through 61, as if fully set forth herein.

64.     Plaintiff entered into the Fee Agreement with Pillsbury on January 24, 2020.  The Fee Agreement was at all relevant times and remains a valid, binding, and enforceable contract.

65.     Although the Fee Agreement is generally terminable at-will by either party upon ten days' prior written notice, neither Plaintiff nor Pillsbury has terminated (nor given notice of its intention to terminate) the agreement.  Even if the Fee Agreement were to have been terminated, by its terms, "any placement activity which is in process or has been completed at the time of termination" would remain subject to the Fee Agreement.

66.     At all relevant times, MLA was aware of the existence of the Fee Agreement.

14

67.     Beginning on or about January 27, 2021, MLA intentionally and improperly facilitated Pillsbury's breach of the Fee Agreement by staking a knowingly baseless claim to the Catterson Placement Fee with Pillsbury.  At all relevant times, MLA acted through its agent, Mullman, who was acting on MLA's behalf within the scope of his employment.

68.     MLA's conduct was without justification and improper.

69.     The breach of the Fee Agreement would not have occurred but for MLA's activities, in that Pillsbury put the Catterson Placement Fee in trust – rather than paying it to Plaintiff on or before June 2, 2021, as contractually required – solely due to MLA's baseless claim to the fee.

70.     Due to MLA's tortious interference, Plaintiff has directly and proximately suffered damages, the amount of such damages to be proven at trial.

71.     As a result of MLA's inducement of Pillsbury to breach, as set out in Paragraphs 49, 52, and 53, Plaintiff has suffered damages in the amount of $375,000 (exclusive of interest and costs) in that Pillsbury failed to make payment of the Catterson Placement Fee to Plaintiff on or before June 2, 2021 as contractually required.

72.     The damages flow directly from, and are the natural and probable consequences of, MLA's inducement of Pillsbury's breach of contract.

73.     MLA's misconduct evinces such a high degree of moral culpability as to warrant punitive damages.  Plaintiff is entitled to punitive damages against MLA in an amount to be determined at trial.

74.     Plaintiff is entitled to interest on the foregoing sums plus the costs of this action, including legal fees.

## PRAYER FOR RELIEF

WHEREFORE, it is respectfully requested that judgment be entered for Plaintiff,

awarding it:

(a) on Plaintiff's First Claim for Relief seeking a Declaratory Judgment, a declaration

that Plaintiff, and not MLA, is entitled to the entirety of the Catterson Placement Fee;

(b) on Plaintiff's Second Claim for Relief for Tortious Interference with Contract, an

award of monetary damages in an amount to be determined at trial, but in any event

no less than $375,000; and an award of attorneys' fees and punitive damages;

(c) an award of such interest as is allowed by law (including pre-judgment and post-

judgment interest);

(d) an award of reasonable attorneys' fees and costs; and

(e) such other relief as the Court deems reasonable and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by

jury in this action of all issues so triable.

Dated:  New York, New York
        August 24, 2021

                                  LAW OFFICE OF DANIEL F. WACHTELL

                                  By:   _____
                                        Daniel F. Wachtell (NY #4689188)
                                  90 Broad Street, 23rd Floor
                                  New York, New York 10004
                                  (917) 667-6954
                                  dan@danwachtell.com
                                  *Attorney for Jordan's Ladder Legal Placements,
                                  LLC*

16

# Exhibit A



# ATTORNEY SEARCH FIRM AGREEMENT

The parties to this Agreement are **PILLSBURY WINTHROP SHAW PITTMAN LLP** (or "Pillsbury") and _Jordan's Ladder Legal Placements, LLC_ (the "Search Firm") (collectively, the "Parties").

1.    Fees.

    (a)    Associate and Other Non-partner Candidates.

If Pillsbury hires a candidate presented by Search Firm for a position (other than a partner position) under circumstances that entitle Search Firm to receive compensation pursuant to this Agreement, Pillsbury will pay Search Firm a fee equal to twenty-five percent (25%) of the candidate's starting annual base salary, subject to the exclusions and limitations set forth in subparagraphs (c) and (d) below.

    (b)    Partner Candidates.

If a candidate presented by Search Firm is admitted as a partner of Pillsbury under circumstances that entitle Search Firm to receive compensation pursuant to this Agreement, Pillsbury will pay Search Firm a fee equal to twenty-five percent (25%) of the candidate's annual base compensation or estimated annual base profit participation (whichever is applicable) as of the date the candidate becomes a member of the Firm.  Fees herein are subject to the exclusions and limitations set forth in subparagraphs (c) and (d) below.  Annual base compensation refers to the total guaranteed compensation that a partner would receive exclusive of bonuses.  If a partner joins Pillsbury as a pure equity partner with no guarantee, the fee to Search Firm would be equal to twenty-five percent (25%) of the partner's annual compensation, which is the product of the number of points guaranteed to the partner multiplied by the current estimated point value.

    (c)    Exclusions and Limitations.

In computing the fee payable to Search Firm under subparagraphs (a) or (b) above, there shall be excluded from the candidate's base compensation or profit participation all employee benefits, relocation expenses, travel and entertainment expenses, automobile allowance, parking allowance, club dues, bar association dues, bonuses or incentive payments.

    (d)    Multiple Referrals.

If Search Firm refers more than one candidate from the same law firm, agency or other organization as a "group" or "package," the fee shall be the amount equal to twenty-five percent (25%) of the annual base compensation or estimated annual base profit participation (whichever is applicable) of the two (2) most highly compensated attorneys of the group hired.   No fees shall be payable with respect to other attorney or non-attorney candidates (including paralegals or other staff) hired as part of such group or package.  If a candidate placed by Search Firm refers new candidates from his or her prior firm or employer after the start of employment at the Firm, Search Firm shall not be entitled to a fee with respect to such newly referred candidates.

(e)    <u>Payment.</u>

Fees are payable within thirty (30) days of Pillsbury's receipt of invoice from Search Firm.

2.    <u>Presentation of Candidates.</u>

Every candidate, including each member of a "group" or "package", must give his/her express permission, preferably in writing, to Search Firm to submit his/her resume and any other information to Pillsbury.  All candidate resumes and supporting materials should be sent in hard copy or electronically to the Recruiting Manager of the office in which the candidate has expressed an interest.

If Pillsbury receives a candidate's resume from more than one source, the resume which was received first, regardless of which Pillsbury office received the resume, will be deemed to be the first resume received by Pillsbury, and only that source will be eligible for a placement fee (if applicable).  Pillsbury will deem that resume to be the exclusive referral of Search Firm for six months from initial receipt of the resume (or for six months after the candidate's last interview with Pillsbury, whichever is later).

In the event that more than one search firm claims the right to a placement fee for placement of a particular candidate or candidates, Search Firm agrees that Pillsbury shall not be obligated to pay an aggregate amount of more than the placement fee or fees described in paragraph 1 above to any and all search firms (including Search Firm) making such a claim.  In addition, it will be the obligation of Search Firm to negotiate directly with any other search firm claiming a right to payment of a placement fee and to reach an agreement as to the percentage (if any) to be paid to each search firm, not to exceed in aggregate the placement fees described in paragraph 1 above.

3.    <u>Referrals by Firm Attorneys and Employees.</u>

Notwithstanding any other provision of this Agreement, Pillsbury will not be obligated to pay Search Firm a fee for hiring a candidate who was referred by an attorney or employee of Pillsbury within six months prior to Search Firm's presentation of that candidate to the Firm.

4.    <u>Guarantee of Candidates.</u>

Search Firm guarantees a successful retention of at least six months for any candidate hired by Pillsbury.  Except in cases where the candidate dies or becomes disabled, if the candidate leaves Pillsbury, or Pillsbury in its sole discretion and judgment discharges the candidate for any reason within six months after the candidate joins Pillsbury, Search Firm will reimburse Pillsbury one-sixth of its fee for each month of such six-month period during which the candidate is not employed by Pillsbury.

5.    <u>Supporting Materials.</u>

When presenting a candidate, Search Firm will submit a current copy of the candidate's resume (a web bio is generally not sufficient unless it includes detailed work history) and, if approved by the candidate, a list of references.  For associate candidates, Search Firm will also submit a copy of the candidate's official law school transcript.  Search Firm should also submit a short narrative describing the candidate's:  (i) background and practice experience and expertise, (ii) reason for seeking new employment, (iii) interest in Pillsbury, and (iv) any other information which Search Firm has reason to believe Pillsbury would wish to know before deciding whether to consider the candidate.  Materials must also include the status of candidate's current bar memberships.

Search firm shall not provide Pillsbury with any documents that are proprietary to any other law firm or employer.

6. <u>Malpractice Claims and Disciplinary Proceedings.</u>

Search Firm shall inquire of the candidate and shall advise Pillsbury if the candidate has been the subject of any malpractice claims or bar disciplinary proceedings. Details of such claims and proceedings must be provided by the candidate in due course, but such details may not include any attorney-client privileged information.

7. <u>Reference Checks; Disclosure of Other Information.</u>

Pillsbury expects each candidate referred to it by Search Firm to have authenticated qualifications, including present employment references where possible. Pillsbury shall be advised whether Search Firm has checked references prior to candidate's initial interview with Pillsbury. All such information received by Pillsbury from Search Firm will be kept confidential.

Search Firm shall not withhold any information about a candidate which it should reasonably understand Pillsbury would normally consider important in its hiring decision, including information obtained through reference checks. Information submitted to Pillsbury shall be the most accurate and current information known to Search Firm.

Search Firm is not authorized to discuss the results of a placement with Pillsbury with any outside party, included the legal press or any other form of media, under any circumstances without the express written consent of Pillsbury.

8. <u>Contact by Search Firm Employees.</u>

If Search Firm has placed a candidate with the Firm under this Agreement or has obtained confidential information from Pillsbury about its employment needs or business, Search Firm shall not, during the subsequent six months, contact Firm partners, associates, paralegals or other employees in an effort to induce them to leave the Firm and seek employment elsewhere through the assistance of Search Firm.

9. <u>Termination.</u>

This Agreement is terminable at will by either party, with or without cause, upon ten (10) days' prior written notice. However, any placement activity which is in process or has been completed at the time of termination shall remain subject to this Agreement.

10. <u>Applicable Law; Arbitration; Attorney's Fees.</u>

This Agreement, and the rights and obligations of the Parties with respect hereto, shall be construed and enforced in accordance with the law of the State of the Pillsbury office which the candidate or candidates would join; provided that in the case of a "group" of candidates joining multiple Pillsbury offices, the law of New York shall than apply.

In the event of any dispute of any kind arising under or relating to this Agreement, the Parties agree to resolve such dispute in binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Such arbitration shall be held in New York, New York, unless the Parties mutually agree upon another location.

In the event of arbitration, or any other proceedings, to enforce any of the terms of this Agreement, the Prevailing Party shall be entitled to recover its reasonable attorneys' fees and costs, including arbitration fees and arbitrator's compensation.

11.     Entire Agreement: Modification.

This Agreement is the entire Agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous oral and written agreements and discussions between the Parties.  This Agreement shall not be construed against any Party on the basis of drafting.  This Agreement may be amended only by an agreement in writing signed by each of the Parties hereto.

12.     Successors and Assigns.

This Agreement is binding upon, and shall inure to the benefit of, the Parties hereto, and their respective representatives, heirs, predecessors, affiliated entities, transferees, assigns and successors in interest.

* * *

Each of the Parties represents and warrants that it has had an opportunity to consult with its attorneys regarding the contents of this Agreement and the advisability of executing this Agreement; that its authorized representative has read this Agreement and understands the contents thereof; that its representative who signs this Agreement on behalf of the Party for which he or she is signing and also has the ability to bind that Party to the obligations and commitments set forth in this Agreement.

By _____          _1/24/20_____
        On behalf of Search Firm          (Sign)                              Date

        Melissa Jordan
        _____
        On behalf of Search Firm          (Print)

By _____          _1/24/20_____
        Partner, on behalf of              (Sign)                              Date
        Pillsbury Winthrop Shaw Pittman LLP

        Charles L. Curtis
        _____
        Partner, on behalf of              (Print)
        Pillsbury Winthrop Shaw Pittman LLP