UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JORDAN'S LADDER LEGAL PLACEMENTS, LLC, <br><br> *Plaintiff,* <br><br> -against- <br><br> MAJOR, LINDSEY & AFRICA, LLC, <br><br> *Defendant.* | No. 21 Civ. 7124 |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT IN LIEU OF ANSWER PURSUANT TO F.R.C.P. 12(b)(6)

SHOOK, HARDY & BACON, LLC
William E. Vita, Esq.
1325 Avenue of the Americas
28th Floor
New York, NY  10019
(212) 989-8844
(929) 501-5455 (fax)
wvita@shb.com

*Attorneys for Defendant*
*Major, Lindsey & Africa, LLC*

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    PLAINTIFF'S ALEGATIONS .............................................................................3

III.   LEGAL STANDARD.........................................................................................10

IV.   LEGAL ARGUMENT.........................................................................................12

      A.     Applicable Law ........................................................................................12

      B.     Plaintiff Fails to Sufficiently State a Cause of Action for Tortious
              Interference ..............................................................................................12

      C.     No Contract Existed Between Jordan's Ladder and Pillsbury Because
              Jordan's Ladder Failed to Meet a Condition Precedent...........................13

      D.     Jordan's Ladder Does Not Establish That MLA Had Knowledge of the
              Terms of the  Purported Contract............................................................16

      E.     Jordan's Ladder Fails to Establish the Breach of a Contract ..................17

      F.     MLA Acted To Protect Its Legitimate Economic Interest In Its Long-
              Standing Client Catterson .......................................................................18

      G.     Jordan's Ladder's Cause of Action for Declaratory Relief is Duplicative of
              the Cause of Action for Tortious Interference With A Contract ...........22

V.     CONCLUSION...................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................................................10, 11

*Banco Indus. De Venezuela, C.A. v. CDW Direct, LLC*,
   888 F. Supp. 2d 508 (S.D.N.Y. 2012)..........................................................................10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................................................10, 11

*Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*,
   259 F.Supp.3d 16 (S.D.N.Y. 2017), *aff'd*, 712 F. App'x 85 (2d Cir. 2018)..........................18

*Carlin v. Davidson Fink LLP*,
   852 F.3d 207 (2d Cir. 2017)..........................................................................................10

*Catalano v. BMW of N. Am., LLC*,
   167 F.Supp.3d 540 (S.D.N.Y. 2016)..........................................................................22

*Chen v. Major League Baseball*,
   6 F.Supp.3d 449 (S.D.N.Y. 2014) ..........................................................................11

*Erie R. Co. v. Tompkins*,
   304 U.S. 64 (1938)..........................................................................................................12

*Germain v. M & T Bank Corp.*,
   111 F.Supp.3d 506 (S.D.N.Y. 2015)..........................................................................11

*Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*,
   2016 WL 4747281 (S.D.N.Y. Sept. 9, 2016)..........................................................................10

*IMG Fragrance Brands, LLV v Houbigant, Inc.*,
   679 F.Supp.2d 395 (S.D.N.Y. 2009)..........................................................................18

*Lazard Freres & Co., v Protective Life Insurance Co.*,
   108 F.3d 1531 (2d Cir. 1997)..........................................................................................12

*Mason v. AmTrust Fin. Servs., Inc.*,
   2020 WL 1330688 (S.D.N.Y. Mar. 23, 2020), *aff'd*, 848 F. App'x 447 (2d Cir.
   2021) ..........................................................................................................................10

*New London Associates, LLC v. Kinetic Social LLC*,
   384 F.Supp.3d 392 (S.D.N.Y. 2019)..........................................................................12, 13

*Nick's Garage, Inc. v. Progressive Casualty Ins. Co.*,
875 F.3d 107 (2d Cir. 2017)..........................................................................13

*Progressive Credit Union v. City of New York*,
889 F.3d 40 (2d Cir. 2018)............................................................................10

*White Plains Coat & Apron Co., Inc. v. Cintas Corp.*,
460 F.3d 281 (2d Cir. 2006)....................................................................12, 20

**STATE: CASES**

*106 N. Broadway LLC v. Lawrence*,
137 N.Y.S.3d 148 (2d Dep't 2020).................................................................12

*Allied Sheet Metal Workers, Inc. v Kerby Saunders, Inc.*,
619 N.Y.S.2d 260 (1st Dep't 1994) ...............................................................13

*Alvord & Swift v. Stewart M. Muller Const. Co.*,
46 N.Y.2d 276 (1978) ....................................................................................18

*Commercial Realty Services of Long Island, Inc. v. Mehran Enterprises, LTD.*,
149 N.Y.S.3d 493 (2d Dep't 2021).................................................................12

*Constant v Hallmark Cards, Inc.*,
568 N.Y.S.2d 441 (2d Dep't 1991).................................................................15

*Felsen v. Sol Café Mfg. Corp*,
24 N.Y.2d 682 (1969) ....................................................................................20

*Foster v Churchill*,
87 N.Y.2d 744 (1996) ...............................................................................18, 20

*Green v. Fischbein Olivieri Rozenholc & Badillo*,
507 N.Y.S.2d 148 (1st Dep't 1986) ...............................................................17

*Haviland v. J. Aron & Co.*,
622 N.Y.S.2d 703 (1st Dep't 1995) ...............................................................13

*Joan Hansen & Co., Inc. v. Everlast World Boxing Headquarters Corp.*,
744 N.Y.S.2d 384 (1st Dep't 2020) ...............................................................13

*Kule Res., Ltd. v. Reliance Grp., Inc.*,
49 N.Y.2d 587 (1980) ....................................................................................14

*Newsday, Inc. v Fantastic Mind, Inc.*,
655 N.Y.S.2d 583 (2d Dep't 1997).................................................................19

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
86 N.Y.2d 685 (1995) ....................................................................................14

iii

*Rhoads v Urban Development Corp.*,
   616 N.Y.S.2d 834 (4th Dep't 1994).........................................................................15

*South Fourth Street Properties, Inc. v. Muschel*,
   766 N.Y.S.2d 851 (2d Dep't 2003)..........................................................................19

*Vigoda v. DCA Productions Plus Inc.*,
   741 N.Y.S.2d 20 (1st Dep't 2002) ...........................................................................12

*White Plains Coat & Apron Co., Inc. v. Cintas Corp.*,
   8 N.Y.3d 422 (2007) ..................................................................................12, 19, 20

## OTHER AUTHORITIES

4F N.Y.PRAC., COM. LITIG. IN NEW YORK STATE COURTS § 131:51 (5th ed.).............................19

Fed. R. Civ. P. 8(a) ........................................................................................................10

Fed. R. Civ. P. 12(b)(6)...........................................................................................1, 16, 22

Federal Constitution.......................................................................................................12

iv

Defendant, Major, Lindsey and Africa, LLC ("MLA") respectfully submits this Memorandum in Support of its Motion, in lieu of an answer, to Dismiss Jordan's Ladder Legal Placements, LLC's ("Plaintiff" or "Jordan's Ladder") Complaint. MLA requests dismissal of both Count I, seeking declaratory relief and Count II, seeking damages for alleged tortious interference with a contract, because the Complaint fails to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.   INTRODUCTION

This case arises because Jordan's Ladder, an attorney search firm, seeks a fee for the lateral movement of attorney James Catterson ("Catterson") to Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") from another firm. Jordan's Ladder seeks this fee despite the fact that Catterson engaged MLA to represent him in the move to Pillsbury and specifically told Jordan's Ladder that it did not represent him. The Complaint's tortious interference with a contract claim is incurably deficient because it fails to adequately allege the following necessary elements of such a claim:

- Jordan's Ladder never obtained express permission (or for that matter, any permission) to represent Catterson and therefore never completed a condition precedent to the formation of a contract with Pillsbury, thus there was no valid contract to interfere with;

- To the extent that a contract existed (which MLA denies), any such contract was not actually breached. Instead, pursuant to the terms of the very contract that Jordan's Ladder is seeking to enforce, Pillsbury, faced with competing claims to a placement fee, placed the fee at issue in escrow until Jordan's Ladder fulfills its contractual obligation to reach an agreement on the fee percentage and therefore, if this court determines that a contract exists, Pillsbury is fully within its contractual rights to hold off on paying any party, until Jordan's Ladder reaches such an agreement;

1

- The Complaint acknowledges that MLA acted out of its own legitimate economic and business interests when it represented its client, Catterson, in his move, as a lateral partner, to Pillsbury and therefore MLA did not act improperly or without justification; and

- The Complaint does not allege that MLA was aware of the terms of the private contract that Jordan's Ladder alleges it had with Pillsbury and therefore fails to satisfy another element of tortious interference with a contract.

Catterson specifically engaged MLA, an attorney search firm that he had a pre-existing relationship with, to represent him in his lateral candidate interactions with Pillsbury.  The one time that Catterson spoke with Jordan's Ladder's principal, Melissa Jordan ("Jordan"), Catterson expressly told Jordan that she did not represent him in his interactions with Pillsbury.  In fact, Jordan's Ladder concedes that Catterson told Jordan that she did not represent him.  Normally, that would be the end of any discussion as to who represented Catterson.  Yet, the Complaint stubbornly claims that Jordan's Ladder somehow represented Catterson, without his express permission to do so, based not any written or oral statements made by him (because there are none), but rather based on what Jordan claims to have subjectively "understood."  In other words, what Jordan's Ladder speculated or concluded (despite Catterson's specific statement to the contrary), is their basis for representing Catterson.  Such speculative and conclusory allegations, based on nothing more than unsupported beliefs, are insufficient to state a cause of action.

Despite the fact that Catterson was represented by MLA and never provided Jordan's Ladder with permission to represent him during his lateral move, the Complaint alleges that MLA "staked" a claim "to the $375,000 placement fee" purportedly due to Jordan's Ladder.  However, even if this assertion was true, which it is not, the law is clear that a party's actions which are based

2

on proper economic interests cannot form the basis of a cause of action for tortious interference with a contract.  Because the Plaintiff's first cause of action, seeking declaratory relief, is duplicative of the second cause of action, tortious interference, it must also be dismissed, because there is no valid basis for such declaratory relief when its determination turns on the core issues of the underlying dispute.

## II.   PLAINTIFF'S ALEGATIONS

The facts in this case are straightforward and leads to the inescapable conclusion that the Complaint fails to state a cause of action.[1]

Jordan's Ladder presents itself as a New York-based legal recruiting firm, "specializing in high-end lateral partner placements at major law firms."  (Complaint, hereinafter Compl. at ¶ 10. The Complaint is attached as Exhibit A to the accompanying Affirmation of W. Vita.)  MLA is also a legal recruiter and therefore a business competitor of Jordan's Ladder and many other legal placement firms.  (Compl. ¶ 1 & ¶ 11.)

On or about January 24, 2020, Jordan signed an Attorney Search Firm Agreement (the "Agreement" or "Fee Agreement") with Pillsbury because Jordan wanted to refer William Bosch ("Bosch") (not Catterson) as a lateral partner candidate to Pillsbury.  (Compl. ¶ 9 & ¶ 23.)  The Agreement is attached as Exhibit A to the Complaint.

When Jordan signed the Agreement, she was working solely on behalf of Bosch in his lateral partner candidacy with Pillsbury.  (Compl. ¶ 21 & ¶ 22.)  Jordan does not contend that she was working, at that time, on behalf of Catterson.

---

[1] MLA quotes the allegations in the Complaint, as it must, in a Rule 12(b)(6) motion to dismiss but does not waive its right to contest such allegations, if necessary, should this litigation proceed past this Rule 12 motion to dismiss.

The Complaint is devoid of any allegation that MLA was aware of the terms of the Agreement.  The Agreement requires Pillsbury to pay a Search Firm, such as Jordan's Ladder, a fee <u>only</u>: "[i]f a candidate presented by Search Firm is admitted as a partner of Pillsbury <u>under circumstances that entitle Search Firm to receive compensation</u> pursuant to this Agreement." (Compl. ⁋ 24, b and Agreement, at Sec. 1(b).  Emphasis added.)

The Agreement goes on to state, in the next section, that "<u>[e]very candidate</u>, including each member of a 'group' or 'package', <u>must give his/her **express permission**</u>, preferably in writing, to Search Firm to submit his/her resume and <u>any</u> other <u>information to Pillsbury</u>."  (Compl. ⁋ 24, e, Agreement Sec. 2.  Emphasis added.)

The Agreement is therefore quite clear that a Search Firm is entitled to a fee **only** if a candidate is admitted as a partner under circumstances that entitle the firm to compensation and such circumstances require the candidate to give express permission to the Search Firm before it can submit any information to Pillsbury.  Absent such express permission, a Search Firm is not entitled to compensation.  Obtaining a candidate's express permission is therefore a condition precedent to the Agreement.

Bosch had some phone interviews with Pillsbury partners in February of 2020.  (Compl. ⁋ 28.)  Due to the pandemic, nothing of further significance occurred until January 12, 2021, when Bosch spoke with Deborah Baum, the partner in charge of Pillsbury's global litigation practice. (Compl. ⁋ 31 & ⁋ 32.)  On that day, Bosch also told Jordan about "the possibility of bringing a colleague along with him to Pillsbury."  (Compl. ⁋ 32.)  That colleague was Catterson, a retired New York state court appellate judge.  (Compl. ⁋ 32 & ⁋ 42.)

The Complaint states that: "<u>Bosch specifically asked Jordan not to reach out to Catterson until Bosch</u> had <u>confirmed</u> Catterson's interest in Pillsbury as well as <u>Catterson's willingness to</u>

speak with Jordan specifically." (Compl. ▯ 32. Emphasis added.) Such confirmation never came. The Complaint does not allege that Catterson ever expressed such a willingness to speak with Jordan. Rather, Jordan's Ladder goes on to contend that "Jordan emailed Bosch" (not Catterson) "to request that Bosch pass her contact information to Catterson if and only if Catterson wanted to discuss the Pillsbury opportunity with her." (Compl. ▯ 33. Emphasis in the original.) The Complaint contains no allegation that: 1) Bosch passed this request or Jordan's contact information on to Catterson; or 2) Catterson informed Bosch that he wanted "to discuss the Pillsbury opportunity" with Jordan.

Remarkably, the Complaint states that "Jordan did not want to interfere if Catterson was working with another recruiter, and understood that Bosch did not want to interfere either" and therefore, "Jordan – consistent with both Bosch's request and industry custom – did not reach out directly to Catterson." (*Id.*) Of course, this self-professed unwillingness to interfere with another recruiter is belied by everything else alleged in the Complaint. Further, the fact that Jordan never reached out to Catterson, the candidate that she claimed to represent (because he never indicated a willingness to "discuss the Pillsbury opportunity with her") is actually a remarkable concession that she did not represent Catterson.

Bosch never indicated or otherwise "confirmed" that Catterson wanted to speak with Jordan. To the contrary, the Complaint does not allege that Bosch ever confirmed Catterson's willingness to speak with Jordan. Nor does the Complaint allege that Jordan ever spoke with Catterson and obtained permission to represent him. Plaintiff does not claim that Catterson ever sent Jordan a letter, an email, a text, a voicemail, a tweet or any other form of communication, whatsoever, which would indicate that Catterson wanted Jordan to represent him in his lateral move to Pillsbury.

Such claims are not included in the Complaint because these things never happened. Indeed, the converse is true.  The only time that Catterson actually spoke with Jordan (on January 27, 2021), he stated unequivocally that Lawrence Mullman ("Mullman") a legal recruiter and partner in MLA's New York office, represented him and that Jordan did not represent him. (Compl. ⁋ 44.)  Mullman had a pre-existing relationship with Catterson. (Compl. ⁋ 2.) Despite the obvious truth that Catterson never wanted or authorized Jordan's Ladder to represent him, Jordan's Ladder persists in its quixotic, albeit unsupported, campaign to collect a placement fee for a candidate it had no authority to represent and who was, instead, actively represented by another legal recruiter, Mullman, at MLA.

Because Jordan did not communicate with Catterson in any manner or form, Jordan's Ladder clearly did not have "express permission," as required in the Agreement, to represent Mr. Catterson in his discussions with Pillsbury.  The Complaint attempts an end-run around the express permission requirement by resorting to Jordan's "understanding" (which is really just her self-serving speculation) that she had permission to represent Catterson.

Lacking express permission, or for that matter, any authorization whatsoever, Jordan nonetheless "proceeded to exchange numerous emails over the next week with Pillsbury and Bosch" (although, tellingly, not with Catterson) "through which she arranged an initial meeting with Catterson and Pillsbury," which her client, "Bosch was scheduled to join."  (Compl. ⁋ 35.) So, in reality, when all else is stripped away, Jordan merely arranged a meeting with Pillsbury for her client, Bosch, in which Catterson would participate.  This does not translate to a provision of express permission to represent Catterson in any negotiations with Pillsbury, especially given the fact that Jordan had never spoken to or communicated with Catterson when she made these arrangements.

6

4891-6736-4096 v4

Faced with the unmovable fact that Jordan had no authorization to represent Catterson, the Complaint contends that "Jordan <u>understood</u>" from "communications with Bosch that Catterson had expressly authorized her - rather than another recruiter – to submit information to Pillsbury in support of his candidacy." (Compl. ¶ 34. Emphasis added.)  Again the referenced communications are with Bosch, not Catterson.  Further, Jordan's alleged "understanding" is baffling because it is based on Bosch's email informing Jordan "of Catterson's availability for a meeting with Pillsbury."  (*Id.*)  But it is Jordan's Ladder's client, Bosch (not Catterson), who asked Jordan to arrange such a meeting and Bosch did not state that Catterson wanted Jordan to represent him.

Thus, Jordan's purported "understanding" is merely the type of conclusory and speculative language that cannot survive a motion to dismiss.  Jordan speculates that she represented Catterson but has not offered a single statement from Catterson to support this naked conjecture.  Instead, Jordan's Ladder purposefully inverts the meaning of the words "express permission" by attempting to substitute reliance on what Jordan "understood" (a word which is subjective, as well as speculative) in place of the Agreement's requirement of actual express permission (an objective statement, which even the Complaint does not contend exists).  This attempt at substitution is misplaced and insufficient.  Jordan's subjective "<u>understanding</u>" (which perhaps existed in her mind, but certainly not in Catterson's mind) is obviously antithetical to the requirement, as contained in the Agreement, that a lateral candidate provide "express permission, preferably in writing," as a condition precedent to any agreement that Jordan's Ladder might form with Pillsbury.

Jordan's Ladder's remaining contention is that "Pillsbury asked Jordan to pass along confidentiality forms to Catterson."  (Compl. ¶ 36.)  Catterson did not ask her to do this.  Jordan then forwarded the forms to Bosch and not to Catterson, a candidate that she still had never

7

communicated with.  The next day Bosch (again, not Catterson) "returned the forms – which <u>appeared</u> to have been completed and signed by Catterson – to Jordan, who forwarded them to Pillsbury."  (Compl. ⁋ 37.  Emphasis added.)  The use of the word "appeared" is curious, as it indicates that Jordan did not know whether Catterson did, in fact, sign the non-disclosure forms. This is an odd statement from someone who claims that she was representing Catterson in his lateral move.  Jordan's uncertainty arises, of course, because she had never communicated with Catterson, much less obtained permission to represent him in any dealings with Pillsbury.

On January 27, 2021, Catterson put an end to any misguided "understanding" that Jordan might have been laboring under, when he "contacted Jordan by telephone" and sternly informed her "that he was represented by [Lawrence] Mullman of MLA."  (Compl. ⁋ 44.)  With an Orwellian twist of language and logic, Jordan is now claiming that she had express permission to represent Catterson, despite the fact that the one and only time that she spoke with Catterson, he expressly told her that she did not represent him.

The Complaint states that, on February 3, 2021, Jordan spoke with Mullman.  (Compl. ⁋ 11 & ⁋ 47.)  Jordan (who is a New York attorney) recorded this call without telling Mullman (who is also a New York attorney) that she was doing so or requesting his permission.[2]  Even putting aside this pre-meditated deceptive conduct, the Complaint does not provide a full transcript of this call.  Nonetheless, the Complaint contends that Mullman "demanded 100% of the Catterson Placement Fee on behalf of MLA."  (Compl. ⁋ 47.)

The Complaint's purported excerpt of the secretly recorded phone call between Jordan and Mullman (to the extent that, at some point, a full recording or transcript may prove the excerpt

---

[2] The New York County Bar Association has published an Opinion stating that a lawyer may not tape record a telephone conversation with an adversary without informing the adversary that the conversation is being taped.  (New York City Bar Association, Formal Opinion 1995-10.)

accurate), actually establishes that Mullman, as a MLA partner, who was representing Catterson, in his dealings with Pillsbury, was acting out of understandable business interests by merely seeking to obtain MLA's fee for such representation.

The Agreement actually anticipates a situation, such as this, where "more than one search firm claims the right to a placement of a particular candidate." (Agreement, at Sec. 2.) The Agreement provides that, in such an instance, "it will be the <u>obligation of the Search Firm [here Jordan's Ladder]</u> to negotiate directly with any other search firm claiming a right to payment of a placement fee and <u>to reach an agreement as to the percentage (if any) to be paid to each search firm.</u>" (*Id.* Emphasis added.) Pursuant to this section of the Agreement, Pillsbury informed plaintiff that it placed "the fee on James Catterson in a trust account pending notification from both parties that the dispute between MLA and [Plaintiff] has been resolved." (Compl. ⁋ 53.) Therefore, Pillsbury has not breached the Agreement by refusing to pay Jordan's Ladder, it is instead, acting in accordance with Section 2 of the Agreement by safeguarding the fee until Jordan's Ladder satisfies its contractual obligation to reach agreement on the percentage, if any, to be paid to each search firm. The fact that Pillsbury has actually followed the contractual provisions, rather than breached those provisions, may explain why Jordan's Ladder has not asserted causes of action against Pillsbury.

Jordan's Ladder's contention that it somehow "represented" Catterson (against his wishes and without his permission) is further undermined by the Complaint's own chronology. The last alleged act committed by Jordan's Ladder occurred on January 26, 2021, when Jordan "forwarded" the Lateral Partner Questionnaire ("LPQ") forms to Bosch (again, not to Catterson). (Compl. ⁋ 39.) On January 29, 2021, Pillsbury partner Deborah Baum told Jordan that Pillsbury intended to pay the "Catterson Placement Fee to MLA," undoubtedly because Mullman was in contact with

4891-6736-4096 v4

Pillsbury and was representing Catterson in his interactions with Pillsbury. (Compl. ⁋ 46.) The Complaint concedes that Jordan did nothing further to "represent" Catterson until she learned in April of 2021, from Pillsbury, that Catterson "would be joining Pillsbury." (Compl. ⁋ 49.) Jordan's Ladder did not aid Catterson in completing the LPQ, submitting the LPQ, advising Catterson about financial matters, negotiating compensation or otherwise doing anything of any tangible benefit for Catterson. The Complaint is silent about who did all of these things but of course, it was Mullman and that is why Pillsbury told Jordan that it would pay the fee to MLA.

## III. LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 8(a), a complaint must set forth a plain statement of the claim showing that the pleader is entitled to relief and this requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 2016 WL 4747281, at *10 (S.D.N.Y. Sept. 9, 2016). A court should dismiss a complaint if it fails to set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009).

As recently stated by Judge Denise L. Cote:

> [a] claim to relief is plausible when the factual allegations in a complaint "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 48 (2d Cir. 2018) (citation omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Carlin v. Davidson Fink LLP*, 852 F.3d 207, 212 (2d Cir. 2017) (citation omitted). The plaintiff must plead enough facts to "nudge[] [its] claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (citation omitted).

*Mason v. AmTrust Fin. Servs., Inc.,* 2020 WL 1330688, at *2 (S.D.N.Y. Mar. 23, 2020), aff'd, 848 F. App'x 447 (2d Cir. 2021).

"[B]are allegations, devoid of allegations of specific conduct, are merely conclusory, and '[c]onclusory allegations are insufficient to survive a motion to dismiss.'" *Banco Indus. De*

*Venezuela, C.A. v. CDW Direct, LLC*, 888 F.Supp.2d 508, 514-15 (S.D.N.Y. 2012).  To state a claim upon which relief can be granted, "[f]actual allegation must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

A complaint must contain "more than labels or conclusion" or "a formulaic recitation of the elements of a cause of action. . . ." *Twombly*, 550 U.S. at 555; *Germain v. M & T Bank Corp.*, 111 F.Supp.3d 506, 519 (S.D.N.Y. 2015) ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (quoting *Iqbal*, 556 U.S. at 678) (internal quotations omitted).

The Court need not accept as true conclusory allegations. *Iqbal*, 556 U.S. at 678; *Chen v. Major League Baseball*, 6 F.Supp.3d 449, 452 (S.D.N.Y. 2014).  A court should evaluate well-pleaded factual allegation to determine whether "they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 557).

Importantly, when a complaint fails to "possess enough heft to 'sho[w] that the pleader is entitled to relief . . ." then "'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Twombly*, 550 U.S. at 557-58 (internal citations omitted).

The Complaint is rife with unsupported legal conclusions, combined with a lack of concrete facts and therefore, no amount of pushing will "nudge" the allegations across the line and above the speculative level.

IV.     **LEGAL ARGUMENT**

A.      **Applicable Law**

Based on the *Erie* Doctrine, the substantive law of New York will apply because this Court's jurisdiction is based upon the parties' diversity of citizenship and the alleged tortious acts are said to have taken place in New York.   *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.").  New York Courts "seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 460 F.3d 281 (2d Cir. 2006), *citing Lazard Freres & Co., v Protective Life Insurance Co.,* 108 F.3d 1531, 1539 (2d Cir. 1997).

B.      **Plaintiff Fails to Sufficiently State a Cause of Action for Tortious Interference**

In order to adequately plead and state a cause of action for tortious interference with a contract under New York law, a plaintiff must plead, in language that is not speculative or conclusory, the following elements:

1.) the existence of a valid contract between plaintiff and another entity;

2.) the defendant had knowledge of the terms of the contract;

3.) the defendant interfered and thereby caused a breach of the contract;

4.) the interference was improper and without justification;

5.) the plaintiff was damaged as a result.

*White Plains Coat & Apron Co., Inc. v. Cintas Corp.,* 8 N.Y.3d 422, 426, (2007); *Commercial Realty Services of Long Island, Inc. v. Mehran Enterprises, LTD.,* 149 N.Y.S.3d 493 (2d Dep't 2021); *Vigoda v. DCA Productions Plus Inc.*, 741 N.Y.S.2d 20 (1st Dep't 2002); *New London Associates, LLC v. Kinetic Social LLC,* 384 F. Supp.3d 392 (S.D.N.Y. 2019); *106 N. Broadway LLC v. Lawrence*, 137 N.Y.S.3d 148 (2d Dep't 2020).

12

It is clear that Jordan's Ladder's Complaint does not establish these elements.

**C.     No Contract Existed Between Jordan's Ladder and Pillsbury Because Jordan's Ladder Failed to Meet a Condition Precedent**

The Complaint fails to establish the existence of the first element of tortious interference, namely, the formation of a valid contract between Jordan's Ladder and Pillsbury.

A cause of action for tortious interference with a contract is unavailable in the absence of a contract. *Joan Hansen & Co., Inc. v. Everlast World Boxing Headquarters Corp.*, 744 N.Y.S.2d 384, 391 (1ˢᵗ Dep't 2020); *Haviland v. J. Aron & Co.,* 622 N.Y.S.2d 703, 704 (1ˢᵗ Dep't 1995) (where there is no contract, "there can be no tortious interference with a contractual relationship").

Because a valid contract is an element of tortious interference, the burden of demonstrating enforceability rests with the plaintiff. *Allied Sheet Metal Workers, Inc. v Kerby Saunders, Inc.,* 619 N.Y.S.2d 260, 264 (1ˢᵗ Dep't 1994).

Curiously, Jordan's Ladder alleges that Pillsbury breached a contract with Jordan's Ladder, although Jordan's Ladder does not actually include Pillsbury as a defendant or assert such a cause of action against Pillsbury.

In order "[t]o state a claim for breach of contract under New York law, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *New London Associates, supra,* at 407, *citing, Nick's Garage, Inc. v. Progressive Casualty Ins. Co.,* 875 F.3d 107, 114 (2d Cir. 2017).

Here, there is both no formation of a contract between the parties and no performance by the plaintiff, because Jordan's Ladder never satisfied the condition precedent by affirmatively obtaining express permission to represent Catterson in his dealings with Pillsbury.   Pursuant to the very Agreement Jordan's Ladder seeks to enforce, such permission must exist to create the

13

circumstances that entitle a Search Firm, such as Jordan's Ladder, to receive compensation for the placement of a lateral partner.

It is black-letter law that a condition precedent is "an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.,* 86 N.Y.2d 685, 690 (1995). In a situation that conceptually addresses whether or not a contract was formed, as is presented here, no contract arises "unless and until the condition occurs." *Id.*

The Agreement specifically required that Jordan's Ladder possess express permission from Catterson to represent him, "preferably in writing," as a condition precedent for forming a contract but Jordan's Ladder never obtained such permission from Catterson in any form, either written or oral. This is not a minor or inconsequential failure. The reason the Agreement contains this condition precedent is specifically to avoid claims such as the one Jordan's Ladder alleges in its Complaint. This contractual requirement was included to prevent legal recruiters from inundating law firms with information regarding candidates that the recruiters do not represent, in the remote hope of garnering a recruitment fee in the future.

Because Jordan's Ladder lacked Catterson's express permission to represent him in his exploration of a lateral move to Pillsbury, Jordan's Ladder failed to establish the condition precedent required to create a contractual right to receive a fee from Pillsbury. *See, e.g., Kule Res., Ltd. v. Reliance Grp., Inc.*, 49 N.Y.2d 587, 591 (1980) (the New York Court of Appeals found in favor of the defendant, ruling that there was no issue of triable fact and that plaintiff was *not* entitled to a finder's fee when the underlying agreement required the written consent of the defendant prior to plaintiff approaching third parties with respect to a sale; here plaintiff admitted that it provided the defendant with the name of a third-party, which ultimately purchased

defendant's company, plaintiff also admitted that prior written consent was never given by defendant to the plaintiff to do so; this demonstrated to the Court of Appeals that something more would be required in order for defendant to incur liability other than the mere furnishing of a prospective purchaser's name); *Constant v Hallmark Cards, Inc.,* 568 N.Y.S.2d 441, 442-43 (2d Dep't 1991) (causes of action for tortious interference were properly dismissed where an underlying sublease required prior written consent to an assignment, which was not alleged to have been obtained).

The Agreement is clear that Jordan's Ladder would be entitled to a fee only if a candidate is admitted as a partner at Pillsbury under circumstances that entitle the recruiter (Jordan's Ladder) to receive compensation.  (Compl. ⁋ 24 a.)

Where, as here, the underlying agreement is unenforceable, dismissal of the claim for inducement of a breach is required.  *Rhoads v Urban Development Corp.,* 616 N.Y.S.2d 834, 835 (4th Dep't 1994).

As discussed above, the Complaint does not actually state that Catterson gave Jordan's Ladder express permission to represent him in his discussions with Pillsbury.  Instead, the Complaint avers that Jordan, as Jordan's Ladder's principal, **understood** (in her mind) that she had such permission.  However, the subjective (and as it turns out erroneous) understanding of one party does not meet or satisfy the express permission requirement that served as a condition precedent to any contract between Jordan's Ladder and Pillsbury.  Therefore, the first element of tortious interference with a contract does not exist because there was no binding contract, as Jordan's Ladder lacked permission to represent Catterson in Pillsbury's recruitment.

### D.        Jordan's Ladder Does Not Establish That MLA Had Knowledge of the Terms of the  Purported Contract

Even if Jordan's Ladder could establish that it did have a binding contract with Pillsbury (which Jordan's Ladder cannot), Jordan's Ladder fails to show (with anything other than vague and conclusory allegations) that MLA (or Mullman) knew of the terms of the contract.  Yet, knowledge of the terms of a contract is one of the elements necessary for a plaintiff to prove in order to establish tortious interference with a contract.

The allegation that "[a]t all relevant times, MLA was aware of the existence of the "Fee Agreement"' (Compl. ⁋ 66), is a glaring example of the type of conclusory, non-factual and threadbare allegations that are insufficient to establish a cause of action and defeat a Rule 12(b)(6) motion.  Notably, the Complaint does not contend that MLA was aware of the **terms** of the Agreement or of any other purported private contract between Jordan's Ladder, one of MLA's business competitors and Pillsbury, a third party.  Yet, knowledge of the terms of a contract is a necessary element of tortious interference.  Nor does the Complaint allege that MLA was ever shown the purported "Fee Agreement."   How can MLA have knowledge of the terms of a contract that it never saw?

The Complaint resorts to "information and belief" in claiming that "if there exists a fee agreement between Pillsbury and MLA, it would be substantively identical to the Fee Agreement between Pillsbury and Plaintiff." (Compl. ⁋ 26.)  Any claim offered upon "belief" is by definition not factual.

Plaintiff's "naked assertions, devoid of further factual enhancement" do not suffice to establish this element of tortious interference with a contract.

4891-6736-4096 v4

### E.    Jordan's Ladder Fails to Establish the Breach of a Contract

Even if Jordan's Ladder could establish that the Agreement was a binding contract between Jordan's Ladder and Pillsbury with regard to Pillsbury's interactions with Catterson (which MLA denies), Pillsbury did not breach such a contract because the Fee Agreement itself provides that, in the event that there are competing claims for a placement fee between attorney placement firms, the placement firm (here, Jordan's Ladder) is required to reach a negotiated agreement on how to split any fee.  Therefore, far from breaching the contract, by placing the fee amount in trust, Pillsbury is following the express terms of the contract.  Pillsbury has not failed to perform, which is one of the elements of breach of contract.

The Fee Agreement is clear on this point: when there are competing claims to a placement fee, "it will be the **obligation of the Search Firm** [here Jordan's Ladder] to negotiate directly with any other search firm claiming a right to payment of a placement fee and **to reach an agreement** as to the percentage (if any) to be paid to each search firm."  (Agreement, at Sec. 2.  Emphasis added.)

Because Jordan's Ladder has not fulfilled its obligation to reach an agreement as to the percentage, if any, to be paid to Jordan's Ladder, Pillsbury has not breached the Fee Agreement, rather it is adhering to the actual terms of the Fee Agreement, by placing the placement fee in escrow until such time as Jordan's Ladder reaches such an agreement on fee percentages.  *See Green v. Fischbein Olivieri Rozenholc & Badillo*, , 507 N.Y.S.2d 148, 151-52 (1st Dep't 1986) ("[a]n escrow agent is a trustee for both parties, under a duty not to deliver the escrow to anyone except upon strict compliance with the conditions.").

4891-6736-4096 v4

F.       **MLA Acted To Protect Its Legitimate Economic Interest In Its Long-Standing Client Catterson**

Even if there was a breach of a contract, which defendant denies, the Complaint fails to establish that MLA caused such a breach, by acting improperly or without justification.  To the contrary, the Complaint clearly asserts that MLA acted to protect its legitimate economic interest in earning a fee for representing Catterson in his move to Pillsbury.

As stated by Judge Paul Engelmayer: "New York courts have developed the 'economic interest defense' to claims of tortious interference with contract. The defense applies when the defendant 'acted to protect its own legal or financial stake in the breaching party's business.'" *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.,* 259 F.Supp.3d 16, 29–30 (S.D.N.Y. 2017), *aff'd,* 712 F. App'x 85 (2d Cir. 2018). Where, as here, a preexisting legal or financial relationship exists between a third-party and the defendant, "[u]nless there is a showing of malice or illegality, a defendant's economic interest in the breaching party's affairs bars an action for tortious interference with contract." *Id., citing Foster v Churchill,* 87 N.Y.2d 744, 749 (1996). "[T]he interference must be intentional, not merely negligent or incidental to some other, lawful, purpose." *Alvord & Swift v. Stewart M. Muller Const. Co.*, 46 N.Y.2d 276, 281 (1978).

When "a complaint supports a defendant's economic interest in the breaching party's business, it is 'insufficient' for a complaint merely to allege the elements of tortious interference; rather, 'the plaintiff must also adequately allege that the defendant either acted maliciously, fraudulently or illegally.'"  *Benihana of Tokyo, supra* at 30*, citing IMG Fragrance Brands, LLV v Houbigant, Inc.*, 679 F.Supp.2d 395, 405-06 (S.D.N.Y. 2009).

The Complaint does not even allege that MLA acted illegally, fraudulently or maliciously. Instead, the Complaint alleges that Mullman, at MLA, had a "preexisting relationship" with

Catterson (Compl. ¶ 2), which caused Catterson to want Mullman to represent him (Compl. ¶ 6). Mullman guided Catterson to a partnership position at Pillsbury because that is what Catterson requested and desired.  Catterson flatly told Jordan that she did not represent him.  (Compl. ¶ 44). The Complaint is devoid of any allegation that Jordan's Ladder counseled Catterson, helped prepare the LPQ, negotiated his compensation or did anything else to facilitate Caterson's move to Pillsbury.  The Complaint does not allege such acts because Jordan's Ladder did not perform such acts, instead they were all performed by Mullman, at MLA.  This is why Pillsbury told Jordan that it "intended to pay the Catterson Placement Fee to MLA." (Compl. ¶ 46.)  Yet, Jordan's Ladder alleges that MLA "improperly facilitated Pillsbury's breach of the Fee Agreement" by claiming a fee that MLA earned for actually representing Catterson, at his request.  If anyone is "staking a knowingly baseless claim to the Catterson Placement Fee," it is Jordan's Ladder, not MLA.

Conduct which is economically motivated reflects a financial interest of the actor and does not constitute actionable interference.  *See*, 4F N.Y.PRAC., COM. LITIG. IN NEW YORK STATE COURTS § 131:51 (5th ed.) *citing: South Fourth Street Properties, Inc. v. Muschel,* 766 N.Y.S.2d, 851, 852 (2d Dep't 2003); *Newsday, Inc. v Fantastic Mind, Inc.,* 655 N.Y.S.2d 583, 585 (2d Dep't 1997) (where the actions at issue were financially motivated no claim for tortious interference with business relations existed).

While a defendant's *generalized* economic interest in soliciting business, for profit, from a breaching party with which it <u>did not</u> have a prior economic relationship, does not constitute a defense to a claim of tortious interference with existing contract; this is not the situation presented in this case. *See, White Plains* 8 N.Y.3d at 425.  The New York Court of Appeals heard and determined *White Plains* after the Second Circuit Court of Appeals certified the following question

to it: "[d]oes a generalized economic interest in soliciting business for profit constitute a defense to a claim of tortious interference with an existing contract for a tortfeasor with no previous economic relationship with the breaching party?" *Id.* The New York Court of Appeals noted that the Second Circuit was "satisfied that the defense [of economic interest] applies when the tortfeasor has a preexisting legal or financial relationship with the breaching party." *Id.*

In the instant matter, the Complaint does not allege that MLA had an existing relationship with Pillsbury (the allegedly breaching party), although such a relationship can be inferred but it does concede that MLA (specifically Mullman) had a pre-existing economic relationship with Catterson, the very person that Jordan's Ladder claims to represent. MLA did not have a generalized economic interest in representing Catterson, it had a specific and individual prior business relationship with him and acted at his request. To the extent that a contract was formed and in turn breached (both assertions are denied by MLA): "procuring the breach of a contract in the exercise of equal or superior right is acting with just cause or excuse and is justification for what would otherwise be an actionable wrong." *White Plains,* 460 F.3d at 283; *Foster,* 87 N.Y.2d at 750-51; *Felsen v. Sol Café Mfg. Corp,* 24 N.Y.2d 682, 687 (1969) (the defendant was "privileged to attempt to protect" its "existing economic interest . . .when it 'interfered' with" a contract). As the Second Circuit observed: a tortious interference claim "protects contracts from interference, but also has the potential to restrain business competition if applied too loosely." *White Plains,* 460 F.3d at 286.

MLA sought to earn a fee for placing its long-standing candidate, Catterson, as a lateral partner at Pillsbury. That is what legal placement firms do. That is their business. The Complaint concedes that Catterson wanted Larry Mullman, at MLA, to be his recruiter (Compl. ⁋ 6). There

is nothing improper about a legal placement firm seeking payment for representing a candidate in a lateral move.

Given that Catterson: 1) was free to choose any legal recruiter he wished; 2) exercised his freedom by choosing MLA, to represent him; and 3) never spoke or communicated with Jordan, except to instruct her that **he did not want Jordan's Ladder to represent him** with his move to Pillsbury, it cannot be plausibly claimed that MLA, which did represent Catterson, pursuant to his express permission, acted illegally, fraudulently or with malice in seeking to be compensated for its services.

Here, MLA's actions are privileged because MLA was exercising a superior right, as it was acting at the request and direction of Catterson, its preexisting and current client, in negotiating his lateral move to Pillsbury. This right is superior because Catterson specifically informed Jordan that she did not represent him in this lateral move. Jordan's Ladder, unhappy with Catterson's choice of a search firm to represent him and thus disappointed with the outcome of normal and expected business competition, attempts, by this litigation, to restrain that business competition. Jordan's Ladder should not be allowed to do so.

Naturally, Mullman and MLA want to be paid for Mullman's efforts. In requesting payment, MLA was and is acting purely out of its own legitimate economic interest and without malice. Indeed, the Fee Agreement actually contemplates and plans for situations where more than one search firm seeks a placement fee. The remedy, as noted above, is for the Search Firm to negotiate an agreement with the other firm. The remedy is not to have one firm sue the other firm and make unfounded allegations of tortious interference. The fact that such disputes are (unfortunately) not unheard of, is a further indication that MLA was acting to protect its own

economic interest and not acting illegally or maliciously to harm Jordan's Ladder (which, in the eyes of both Catterson and Pillsbury, had never secured the right to represent Catterson).

G.    **Jordan's Ladder's Cause of Action for Declaratory Relief is Duplicative of the Cause of Action for Tortious Interference With A Contract**

The first cause of action for declaratory judgment should be dismissed because it is duplicative of the second cause of action sounding in tortious interference with contract. When a claim for declaratory relief is duplicative of another claim, it should be dismissed. *Catalano v. BMW of N. Am., LLC*, 167 F. Supp.3d 540, 563 (S.D.N.Y. 2016). Here, Plaintiff seeks a determination that Jordan's Ladder and not MLA is entitled to receive the entirety of the Catterson placement fee. However, in order to make such a declaration, the Court would have to consider issues at the core of this dispute and those issues would be duplicative of Plaintiff's other claim for tortious interference by MLA with the Fee Agreement.

V.    **CONCLUSION**

Jordan's Ladder has failed to state a claim as to either Count I or Count II in the Complaint under Federal Rule of Civil Procedure 12(b)(6).

With Count I, Jordan's Ladder has failed to state a claim for declaratory relief because a finding of the declaratory relief as articulated by Jordan's Ladder would necessarily require a determination of the core issues underlying Jordan's Ladder's claim for tortious interference with contract as plead in Count II.

At the same time, Jordan's Ladder's claim for tortious interference with a contract fails to state a viable cause of action. As shown above, the Complaint fails to adequately allege: that a valid contract existed between Jordan's Ladder and Catterson; that MLA had knowledge of the terms of such a contract, if one was indeed formed; and, if a contract *was* formed, that MLA

22

improperly and maliciously interfered with and caused a breach of such a contract and in doing so caused damage to Jordan's Ladder.

Even if a contract was formed, the Complaint clearly asserts that MLA acted to protect its legitimate economic interest in earning a fee for representing Catterson, who was a long-standing candidate of MLA that wished to carry on his relationship with the firm.  MLA was certainly justified in continuing to represent its candidate, Catterson, at his request and there is nothing improper in MLA seeking to be fully compensated for its successful representation of its candidates.

WHEREFORE for the foregoing reasons, MLA requests that the Court dismiss the Complaint for failure to state a claim.

Dated: New York, New York
      October 26, 2021

                                        SHOOK, HARDY & BACON L.L.P.

                                        William E. Vita, Esq.
                                        1325 Avenue of the Americas
                                        28th Floor
                                        New York, NY  10019
                                        (212) 989-8844
                                        (929) 501-5455 (fax)
                                        wvita@shb.com

                                        *Attorneys for Defendant*
                                        *Major, Lindsey & Africa, LLC*