UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JORDAN'S LADDER LEGAL PLACEMENTS, LLC,

                            Plaintiff,                  No. 21 Civ. 7124 (CM)

       -against-

MAJOR, LINDSEY & AFRICA, LLC,

                           Defendant.

# MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

**LAW OFFICE OF**
**DANIEL F. WACHTELL**

Daniel F. Wachtell
90 Broad Street, 23rd Floor
New York, New York 10004
(917) 667-6954
dan@danwachtell.com

*Attorneys for Plaintiff Jordan's*
*Ladder Legal Placements, LLC*

November 19, 2021

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND................................................................................................3

LEGAL STANDARD...........................................................................................................5

ARGUMENT ........................................................................................................................6

    A.  Plaintiff Alleges Sufficient Facts to State a Claim for Tortious Interference with
        Contract.................................................................................................................7

        1.  A Valid, Enforceable Contract Existed Between Plaintiff and Pillsbury ....................8

            a.  Assuming Arguendo That the Condition Precedent Was Unmet, the Contract Is
               Still Valid and Enforceable......................................................................................8

            b.  The Condition Precedent of "Express Permission" Is Satisfied ...........................11

        2.  The Complaint Sufficiently Alleges That MLA Was Aware of the Fee Agreement...14

        3.  The Complaint Sufficiently Alleges Pillsbury's Breach...............................................16

        4.  The Complaint Sufficiently Alleges that MLA's Interference Was Intentional and
           Unjustified.................................................................................................................19

        5.  The Complaint Alleges that Plaintiff Was Damaged by Defendant's Tortious
           Interference ...............................................................................................................21

    B.  Plaintiff's Claim for a Declaratory Judgment Presents a Live Issue for Resolution
        Irrespective of Whether Plaintiff's Claim for Tortious Interference Is Dismissed...........21

CONCLUSION.....................................................................................................................24

## **TABLE OF AUTHORITIES**

**Cases**

*AB Oil Servs., Ltd. v. TCE Ins. Servs., Inc.*, 1133 N.Y.S.3d 638 (2d Dep't 2020) ........................21

*Arista Recs., LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) .............................................................15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................5, 6, 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................6, 15

*Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.,* 259 F. Supp. 3d 16 (S.D.N.Y. 2017) ..20

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293 (S.D.N.Y. 2003) ....22

*Farkas v. Grp. Health Inc.*, 2019 WL 2235959 (S.D.N.Y. May 19, 2019) ....................................6

*Johnson v. AGS CJ Corp.*, 844 F. App'x 453 (2d Cir. 2021) .......................................................12

*Lansco Corp. v. Strike Holdings LLC*, 90 A.D.3d 427 (1st Dep't 2011) ......................................10

*Matthew v. RCN Corp.*, 2012 WL 5834917 (S.D.N.Y. Nov. 14, 2012) .......................................22

*Medtech Prod. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778 (S.D.N.Y. 2008) ...............................7, 14

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685 (1995) ...................9, 10

*Pearson Cap. Partners LLC v. James River Ins. Co.*, 151 F. Supp. 3d 392 (S.D.N.Y. 2015) ........3

*Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 3d 318 (S.D.N.Y. 2017) ...................16

*State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322 (S.D.N.Y. 2020) ..............7, 14, 15

*White Plains Coat & Apron Co., Inc. v. Cintas Corp.,* 8 N.Y.3d 422 (2007) ................................7

**Secondary Sources**

Black's Law Dictionary, 11th ed. 2019 .......................................................................................12

## INTRODUCTION

Plaintiff Jordan's Ladder Legal Placements, LLC ("Jordan's Ladder") respectfully submits this Memorandum in Opposition to the Motion to Dismiss, filed on October 26, 2021, by Defendant Major, Lindsey and Africa, LLC ("MLA").  Defendant's motion (the "Motion" or "MTD") seeks dismissal of Jordan's Ladder's claims for tortious interference and for declaratory judgment on the grounds that Plaintiff's Complaint (the "Complaint") fails to state a claim upon which relief can be granted.

The Motion should be denied.  The Complaint plainly alleges facts sufficient to support each element of a claim for tortious interference under New York law, and in adjudicating the Motion, the Court must accept those well-pleaded allegations of the Complaint as true, rather than crediting Defendant's misleading and incomplete recounting of the relevant factual history (and misapplication of the applicable law, to boot).  Moreover, Defendant's *ipse dixit* argument concerning the supposedly duplicative nature of Plaintiff's declaratory judgment claim is both factually inaccurate and legally unsound.  Even if this Court had any basis to dismiss Plaintiff's tortious interference claim (which it does not), Plaintiff has still sufficiently alleged a live dispute between the parties, with competing legal claims of title to specific assets, which is properly before this Court to resolve.

At base, this case concerns the entitlement to a placement fee for the lateral move of a law firm partner, James Catterson.  The parties – both legal recruiting firms – each believe this fee (the "Catterson Fee") is rightfully theirs.  Defendant's principal basis for seeking dismissal is that Catterson, the lateral partner, supposedly did not give his express permission to Plaintiff's principal, Melissa Jordan ("Jordan") to present him as a candidate to the new firm, Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury").  Defendant thus claims that Plaintiff failed to meet a

1

condition precedent to its contractual entitlement to the fee under its written agreement with Pillsbury (the "Fee Agreement").

In fact, Plaintiff has alleged facts sufficient to satisfy each of the elements of a tortious interference claim:  the existence of a contract between Plaintiff and Pillsbury (and, contrary to Defendant's assertion, the satisfaction of the condition precedent of express permission); Defendant's awareness of that contract; that Defendant's interference caused Pillsbury's breach of the contract; that Defendant's interference was improper and unjustified; and that Plaintiff was damaged as a result.  And, as a larger matter, Defendant's framing ignores that Plaintiff has alleged the simple fact that Jordan did *all* of the work necessary to present Catterson as a candidate under the Fee Agreement with Pillsbury, and that Defendant did *none whatsoever*. Defendant's claim to the Catterson Fee, such as it is, rests exclusively on the *preexisting relationship* between Catterson and Defendant's agent Lawrence Mullman ("Mullman"), which was unrelated to the Pillsbury move and was not brought to bear on this situation until *after* Catterson had already been presented to Pillsbury by Jordan; it thus has no legal significance at all.  Yet Defendant has continued to pursue the Catterson Fee, staking a claim to the Fee despite having no legal entitlement to it, and thus depriving Plaintiff of the benefit of its bargain with Pillsbury.  This forms the substantive basis for Plaintiff's tortious interference claim, and likewise forms the basis for Plaintiff's full entitlement to the Catterson Fee, which is the issue about which Plaintiff seeks a declaratory judgment from this Court.

## FACTUAL BACKGROUND[1]

As set forth in the Complaint, Jordan undertook significant effort to facilitate Pillsbury's recruitment and hiring of its lateral partners William Bosch and James Catterson, whereas Defendant had no timely involvement, swooping in only after Plaintiff had earned the Catterson Fee, in a disingenuous attempt to cloud title to that payment.

The specific facts that are relevant to this matter, as set forth in the Complaint and the Fee Agreement attached thereto, primarily concern the timeline of events over approximately a two-week period in January 2021.  While those facts are set forth in detail below, the overarching takeaway is simple:  Until Jordan had presented Catterson to Pillsbury – which was complete by January 26, 2021, at the very latest – Catterson had not once suggested that Mullman was his recruiter; Catterson had given every indication that he knew Jordan to be presenting him and was authorizing her to do so; and Mullman had done nothing at all with respect to Catterson's move to Pillsbury.  The facts that Catterson subsequently realized that he wanted Mullman to be credited as his recruiter, and wanted Mullman to represent him going forward vis-à-vis Pillsbury, and that Mullman later took other steps on Catterson's behalf, are wholly irrelevant.  To wit, and as set forth in the Complaint:

- January 24, 2020:  Jordan signs Pillsbury's standard Fee Agreement.  Compl. ¶ 23.

- January 29, 2020:  Jordan shares Bosch's name with Pillsbury as a potential candidate.  Compl. ¶ 27.

---

[1] This factual recitation is based on well-pled allegations in the Complaint, which must be accepted as true for the purposes of this motion to dismiss, as well as the exhibit attached thereto, which can properly be considered in the resolution of such a motion "without converting the motion to dismiss into a motion for summary judgment."  *Pearson Cap. Partners LLC v. James River Ins. Co.*, 151 F. Supp. 3d 392, 400 (S.D.N.Y. 2015).

- <u>February 2020</u>:  Bosch interviews on three separate days with Pillsbury partners. Compl. ¶ 28.

- <u>December 16, 2020</u>:  After a ten-month delay occasioned by Covid, Jordan contacts Pillsbury again on behalf of Bosch.  Compl. ¶¶ 30-31.

- <u>January 12, 2021</u>:  Bosch interviews with Deborah Baum of Pillsbury, and reports to Jordan (the same day) that he broached with Baum the possibility of bringing Catterson to Pillsbury with him.  Jordan asks Bosch to connect her with Catterson if and only if Catterson is interested and does not already have a recruiter.  Compl. ¶¶ 32-33.

- <u>January 13, 2021</u>:  Bosch emails Jordan to inform her of Catterson's availability for a meeting with Pillsbury, which he asks Jordan to arrange.  Compl. ¶ 34.  Over the subsequent week, Jordan arranges an initial meeting for January 25 between Catterson and Pillsbury (and Bosch) through emails with Pillsbury and Bosch, who was acting explicitly as an intermediary to Catterson.  Compl. ¶¶ 35-36.

- <u>January 21, 2021</u>:  Jordan forwards to Bosch confidentiality forms, asking him to pass them along to Catterson for Catterson to complete and return.  Compl. ¶ 36.

- <u>January 22, 2021</u>:  Bosch returns completed confidentiality forms, which had been completed and signed by Catterson, to Jordan, who forwarded them to Pillsbury. Compl. ¶ 37.

- <u>January 25, 2021</u>:  Bosch and Catterson meet together with Pillsbury.  Bosch gives Jordan feedback by phone later on the same day, and confirms that Catterson knew to reach out to Jordan if he had any questions about Pillsbury.  Compl. ¶ 38.

- <u>January 26, 2021</u>:  Pillsbury sends Lateral Partner Questionnaire (LPQ) forms to Jordan to be completed by Bosch and Catterson.  Jordan forwards the forms to Bosch, who forwarded Catterson's form to Catterson.  Compl. ¶ 39.[2]

As alleged in the Complaint, at this point, Catterson – a former justice of the Appellate

Division – had been presented to Pillsbury within the standard definition of what it means for an

---

[2] Defendant argues that "Jordan's Ladder did not aid Catterson in completing the LPQ [lateral partner questionnaire], submitting the LPQ, advising Catterson about financial matters, negotiating compensation or otherwise doing anything of any tangible benefit for Catterson.  The Complaint is silent about who did all of these things but of course, it was Mullman and that is why Pillsbury told Jordan that it would pay the fee to MLA."  MTD at 10.  To the contrary:  the Complaint is silent about who did all of these things because they are irrelevant to the analysis of whether Plaintiff *presented Catterson to Pillsbury*, which (a) is all that the Fee Agreement requires and (b) was complete before Mullman ever arrived on the scene.  Compl. ¶¶ 41-42.

experienced partner-level candidate to be "presented" as a lateral hire, as described in Section 2

("Presentation of Candidates") of the Fee Agreement, because Plaintiff had given his name to

Pillsbury with his authorization.  *See* Compl. ¶ 42.

Subsequently, on January 27, 2021, Catterson called Jordan and, for the first time,

indicated that he had a relationship with Mullman.  Compl. ¶ 44.  On January 29, 2021, Pillsbury

partner Deborah Baum called Jordan and notified her that Pillsbury intended to pay the Catterson

Placement Fee to MLA.  Compl. ¶ 46.  On February 3, 2021, Jordan spoke with Mullman, who

said that he was representing Catterson with respect to Pillsbury and demanded 100% of the

Catterson Fee on behalf of MLA.  Compl. ¶ 48.  During that call, Mullman threatened Jordan

that, if she persisted in seeking the Catterson Fee, both Catterson *and* Bosch "will go elsewhere

rather than see that happen and *you'll end up with nothing*."  Compl. ¶ 48 (emphasis added).

However, Mullman *never* claimed that he or MLA had done anything to actually entitle it to the

Catterson Fee under either Plaintiff's Fee Agreement with Pillsbury or any other contract.[3]

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain

statement of the claim."  *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).  Rule 8 "does not

require detailed factual allegations"; rather, "to survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

---

[3] Defendant contends that the Complaint does not offer a complete transcript of the recorded call
between Mullman and Jordan, and expresses doubt as to whether "a full recording or transcript
may prove the excerpt [in the Complaint] accurate."  MTD at 8.  This is quite disingenuous, as
Plaintiff's counsel has already shared the entire recording of the call between Mullman and
Jordan with Defendant's counsel in pre-litigation discovery.  While the recording was shared
subject to settlement privileges, Defendant should not be heard to make bad-faith arguments to
this Court, speculating about the contents of the recording, which ignore the fact that it has the
full recording in hand.

face." *Id.*   "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A motion to

dismiss analysis is "a context-specific task that requires the reviewing court to draw on its

judicial experience and common sense." *Farkas v. Grp. Health Inc.*, No. 18 Civ. 8535 (CM),

2019 WL 2235959, at *3 (S.D.N.Y. May 19, 2019) (quoting *Iqbal,* 556 U.S. at 678).

## ARGUMENT

As pled in the Complaint and as noted above, Plaintiff, which had a valid, enforceable

agreement with Pillsbury, did all the work necessary to present Catterson as a candidate to the

firm, with Catterson's full knowledge and authorization, as conveyed through Bosch.  Plaintiff

was careful to comply with the well-accepted norms of the legal recruiting profession with

respect to Catterson because if another search firm *was* already involved on Catterson's behalf,

that firm might have had a proper claim to part or all of the Fee.  Of course, *no such firm existed*,

as Defendant had done absolutely nothing (and Catterson himself had not ever raised the specter

of Defendant's involvement) until *after* the conditions precedent for Plaintiff to receive the

Catterson Fee had already been met; noticeably, Defendant's motion to dismiss does not even

claim otherwise.  Thus, with respect to Plaintiff's first claim for declaratory judgment, the proper

conclusion to reach from the facts pled and the reasonable inferences that can be drawn is that

Plaintiff has a superior claim to title to the Catterson Fee as compared with Defendant, which has

none.

And, the only reason that these claims are even before this Court is that instead of

Pillsbury paying the Catterson Fee directly to Plaintiff, as should have occurred under the Fee

Agreement, Pillsbury was instead importuned by Defendant's malicious, intentional conduct to

6

direct the Fee elsewhere.  Because Defendant knew that it had no contractual claim to the Fee, and nevertheless staked a claim to it, thereby depriving Plaintiff of the benefit of its bargain with Pillsbury, Plaintiff successfully states a claim for tortious interference with contract, and Defendant's motion should be denied.

## C.  Plaintiff Alleges Sufficient Facts to State a Claim for Tortious Interference with Contract

"Under New York law, the elements of tortious interference with contract are (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Medtech Prod. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 796 (S.D.N.Y. 2008).[4]

Defendant contends, briefly, that:  (1) there was never a valid contract between Plaintiff and Pillsbury because a condition precedent to contract formation was unmet; (2) that the second element is not satisfied because Defendant was not fully aware of the *terms of* the Fee Agreement; (3) Pillsbury was not technically in breach of the Fee Agreement because placing the Catterson Fee in escrow was proper performance under the circumstances; and (4) Defendant justifiably acted in defense of its own economic interest if it did interfere with the contract

---

[4] Defendant's Motion, however, reproduces the second element of that standard as follows:  "2. the defendant had knowledge of *the terms of* the contract."  MTD at 12 (emphasis added) (citing *White Plains Coat & Apron Co., Inc. v. Cintas Corp.,* 8 N.Y.3d 422, 426, (2007)).  Then Defendant follows this prejudicial misstatement with a string cite to four more cases – every single one of which *correctly* states the standard.  That is, each of the five says clearly that the second element requires the breaching defendant to have knowledge *of the contract*, not of its terms.  *Cf. State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 349 (S.D.N.Y. 2020) ("under New York law, a plaintiff must have *some* knowledge of the terms and conditions of the allegedly-interfered-with contract but perfect or precise knowledge is not required") (emphasis added).

7

between Plaintiff and Pillsbury, and thus has a complete defense to a tortious interference claim. (Defendant does not contest that Plaintiff properly alleges damages.)  Each of these elements, however, is sufficiently supported by the facts alleged in the Complaint, as well as plausible inferences that can be drawn therefrom.  Therefore, Defendant's motion to dismiss should be denied.

1.   A Valid, Enforceable Contract Existed Between Plaintiff and Pillsbury

The Complaint alleges that Plaintiff and Pillsbury had a valid and enforceable contract relating to Plaintiff's provision of attorney search firm services.  Compl. ¶¶ 23-24.  In response, Defendant contends that "there was no binding contract, as Jordan's Ladder lacked permission to represent Catterson in Pillsbury's recruitment."  MTD at 15.  This argument fails, largely for two reasons:  if there had been a lack of express permission, it would not vitiate the existence of the contract between Plaintiff and Pillsbury; and in any event Plaintiff *did* receive express permission, via Bosch, to represent Catterson vis-à-vis Pillsbury.

a.   *Assuming Arguendo That the Condition Precedent Was Unmet, the Contract Is Still Valid and Enforceable*

Plaintiff and Pillsbury entered into the Fee Agreement on or about January 24, 2020. Compl. ¶ 23.  All of the hallmarks of a properly formed contract – offer, acceptance, consideration – are present in that agreement, which is a standard boilerplate contract used by Pillsbury in its dealings with legal search firms like both Plaintiff and Defendant.  Compl. ¶¶ 23-25.  Defendant does not contend otherwise.

Defendant argues that the supposed absence of a condition precedent – Catterson's granting express permission to Plaintiff to present him – vitiates the existence of the contract itself, and thus negates the possibility of tortious interference.  *See* MTD at 13 ("Here, there is both no formation of a contract between the parties and no performance by the plaintiff, because

Jordan's Ladder never satisfied the condition precedent by affirmatively obtaining express permission to represent Catterson in his dealings with Pillsbury.").  This simply misunderstands basic principles of contract law.

"A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises. Most conditions precedent describe acts or events which must occur before a party is obliged to perform a promise made pursuant to an existing contract, a situation to be distinguished conceptually from a condition precedent to the formation or existence of the contract itself." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (1995) (internal citations omitted).  If, as Defendant argues, the condition precedent here was unmet, then what would be vitiated would not be the formation of the contract itself, but rather Pillsbury's specific obligation to pay the Catterson Fee to Plaintiff at this time.

This makes perfect sense, of course:  Plaintiff's contract with Pillsbury is not specific to Catterson (or Bosch), but sets forth the parameters for Plaintiff to earn a fee for *any* candidate that it presents to Pillsbury.  Indeed, as the Complaint alleges, Plaintiff *did* earn a fee – the Bosch Fee – from Pillsbury under the very same contract.  Moreover, Pillsbury's belief that it was acting consistent with the Fee Agreement in taking actions with respect to the Catterson Fee – *i.e.*, putting it in escrow pending the resolution of this dispute – is additional, clear evidence that the contract itself was properly formed.  Not only that, but the Complaint sufficiently alleges that the Contract was properly formed and continues in force to this day, irrespective of whether or not Plaintiff earned a fee for Catterson in particular.  *See* Compl. ¶¶ 64-65 ("The Fee Agreement was at all relevant times and remains a valid, binding, and enforceable contract. . . . Even if the Fee Agreement were to have been terminated, by its terms, 'any placement activity which is in

9

process or has been completed at the time of termination' would remain subject to the Fee Agreement."). Thus, the proper consequence of a condition precedent being unmet – if that were the case here – would be that Pillsbury's "duty to perform a promise in the "Fee Agreement would not arise, *see Oppenheimer & Co.*, 86 N.Y.2d at 690, not that the Fee Agreement itself would cease to exist.

No case cited by Defendant supports the notion that the contract was not properly formed, or that the absence of the condition precedent does anything more than vitiate the obligation to perform. Put differently, there is no support in the Motion for the proposition that a third party cannot be said to tortiously interfere with a contract of this nature – *i.e.*, one that imposes upon one of the contracting parties an indefinite number of independent duties to perform whenever a separate condition precedent is met for each (what we might commonly call a commission agreement). *See, e.g., Lansco Corp. v. Strike Holdings LLC*, 90 A.D.3d 427, 428 (1st Dep't 2011) (tortious interference adequately pled where defendants "conspired to interfere with [Plaintiff's] right to be the real estate broker for a lease agreement between Strike and the nonparty premises owner" and thus denied Plaintiff commissions).

In other words, Plaintiff made a bargain with Pillsbury, and was supposed to receive the benefit of that bargain each time that the condition precedent was met. Plaintiff received the benefit when the condition precedent was met as to Bosch, but did not receive it when the condition precedent was met as to Catterson, because Defendant interfered in a tortious manner, *see infra* at 19-20. This is a very different thing than saying that that the contract was not properly formed because the condition precedent was (allegedly) unmet as to Catterson.

   b.   *The Condition Precedent of "Express Permission" Is Met Through Bosch's*
        *Actions*

The above argument is academic, however, because the Complaint unambiguously pleads

facts establishing that Catterson had given his "express permission" for Plaintiff to present him

as a candidate to Pillsbury, and thus the condition precedent is met.  As set forth previously, the

Complaint alleges a timeline of the interactions between Jordan and Bosch showing that Jordan

both sought and received clear direction and authorization from Bosch, who was acting as an

intermediary for Catterson, to undertake the steps that, as a matter of common industry practice,

amount to "presenting" Catterson as a candidate to Pillsbury.

   In brief, the Complaint alleges the following (which is set forth at greater length and

detail at pages 3-4, *supra*):  Bosch informed Jordan that Catterson might be interested in joining

Pillsbury with him; Bosch asked Jordan not to reach out to Catterson directly; Bosch then served

as an intermediary to explicitly convey information back and forth between Jordan and

Catterson; Catterson never indicated that he was working with another recruiter; and Jordan

(through Bosch) did every step necessary to present Catterson as a candidate to Pillsbury,

*i.e.* (1) giving Pillsbury Catterson's name with his knowledge; (2) providing Pillsbury with

relevant documents that Catterson had completed; and (3) scheduling the January 25, 2021

meeting for Catterson with Pillsbury.  *See generally* Compl. ¶¶ 31-41.

   As further set forth in the Complaint, these steps satisfy the industry standard for

"presenting" a partner-level candidate as a lateral hire to a new firm:  "A partner-level candidate

is considered to be presented, and to be exclusively presented by a specific recruiter, when that

recruiter gives the individual's name to the law firm with the individual's authorization."

Compl. ¶ 41.  The Complaint further alleges that "for any candidate – irrespective of seniority –

that candidate would indisputably be deemed to have been presented once they actually met with

                                    11

the new law firm."  Compl. ¶ 42.  In other words, Catterson – via Bosch – gave Jordan permission to give his name to Pillsbury and schedule his interview, and Jordan did so, thus satisfying the condition precedent that Defendant alleges to be lacking.

Defendant asserts that "The Agreement specifically required that Jordan's Ladder possess express permission from Catterson to represent him, 'preferably in writing,' as a condition precedent for forming a contract[,] but Jordan's Ladder never obtained such permission *from Catterson* in any form, either written or oral."  MTD at 14 (emphasis added).  But what Defendant *does not* argue is perhaps more telling:  nowhere does Defendant contend, or cite any case law, that Catterson could not convey his express permission to Jordan *via Bosch*, or that Catterson's authorization of Jordan to submit him to Pillsbury was not abundantly clear from his actions.  And the reason for Defendant's omission is clear: nowhere does Jordan's Ladder's agreement with Pillsbury require that the permission be received *directly* from Catterson (or any other candidate), and no case law (either cited by Defendant or of which Plaintiff is aware) precludes "express permission" from being granted by a third party (*i.e.*, Bosch), or from being inferred by actions of the grantor of which the grantee was aware.

The fact that this permission was conveyed by Bosch to Jordan, rather than by Catterson to Jordan, likewise does nothing to make the permission any less "express," *i.e.*, "clearly and unmistakably granted by actions or words, oral or written."  Black's Law Dictionary, 11th ed. (2019) (defining "express permission"); *see also Johnson v. AGS CJ Corp.*, 844 F. App'x 453, 454 (2d Cir. 2021) (discussing Merriam-Webster's definition of "permit" as "to consent to expressly or formally" or "to give leave; authorize").  This plain-language definition does nothing to suggest that express permission cannot be conveyed through an intermediary, and easily embraces the facts of this case:  Catterson expressed his permission to Jordan to present

12

him to Pillsbury through his clear actions vis-à-vis Bosch, which enabled Jordan to take all of the necessary steps to present him within the meaning of the contract and industry practice.  Had Catterson – knowing that Bosch was using Jordan as the intermediary for them both, as alleged in the Complaint – wished *not* to convey his permission, or to withhold it, he could easily have done so by timely notifying Bosch that he did not want Jordan to act on his behalf, or by timely notifying Jordan of the same.  *See, e.g.*, Compl. ¶ 38 ("Bosch specifically confirmed, during the January 25 call with Jordan, that Catterson knew to reach out to Jordan if he had any questions about Pillsbury.").  Or, he could have made clear in a timely manner that he wished to authorize – that is, to expressly permit – Defendant's agent Mullman to act on his behalf.  But again, as set forth in the Complaint, he did neither (and Defendant does not argue to the contrary).

Defendant's papers mischaracterize Plaintiff's allegation clearly setting forth how Catterson's "express permission" was conveyed to Plaintiff.  To wit, Defendant writes:

> "The Complaint does not actually state that Catterson gave Jordan's Ladder express permission to represent him in his discussions with Pillsbury. Instead, the Complaint avers that Jordan, as Jordan's Ladder's principal, **understood** (in her mind) that she had such permission. However, the subjective (and as it turns out erroneous) understanding of one party does not meet or satisfy the express permission requirement that served as a condition precedent to any contract between Jordan's Ladder and Pillsbury."

MTD at 15 (emphasis in original).

First, as Plaintiff explains above, the Complaint adequately alleges facts from which it can be reasonably inferred that Catterson *in fact did* give Jordan "express permission" to represent him, *i.e.*, through his communications with Bosch, which he fully knew were being conveyed to Jordan for the purpose of enabling her to present him to Pillsbury.

Second, Defendant's pejorative characterization of the Complaint's use of the word "understood," though evidently meant to influence the resolution of this Motion, is immaterial at this stage of proceedings.  The Complaint alleges that Jordan formed the belief that Catterson

13

had authorized her to present him, and further alleges facts sufficient to support that understanding.  The question of whether or not Jordan was "erroneous" in her understanding, as a matter of law, cannot be resolved without factual development, and thus is not properly before the Court at this time.[5]

2.   The Complaint Sufficiently Alleges That MLA Was Aware of the Fee Agreement

Under New York law, "a defendant need not be aware of all the details of a contract[;] it must have actual knowledge of the specific contract that is the subject of the claim." *Medtech Prods.*, 596 F. Supp. 2d at 796.  Plaintiff need only allege that Defendant knew of the existence of the contract, and at most "some knowledge" of its terms and conditions, but not the details of the same; "perfect or precise knowledge is not required." *State St. Glob. Advisors*, 431 F. Supp. 3d at 349; *see also New London Assocs.*, 384 F. Supp. 3d at 407–08 (listing elements of claim).

The Complaint sufficiently alleges that MLA, either directly or through its agent Mullman, (a) knew that Jordan had a contract with Pillsbury before and while it interfered with the contract; and (b) knew or should have known the general terms and conditions of that contract.  Specifically, the Complaint avers that Jordan conveyed to Mullman during their February 3, 2021 conversation the fact that there was a contractual agreement between Plaintiff and Pillsbury.  Compl. ¶ 48.  Moreover, this Court can infer from the facts pled that Defendant, a legal search firm, would have been well aware that Plaintiff, also a legal search firm, would not

---

[5] Defendant asserts that the express permission clause "was included to prevent legal recruiters from inundating law firms with information regarding candidates that the recruiters do not represent, in the remote hope of garnering a recruitment fee in the future."  MTD at 14.  But, as pled in the Complaint, nothing of the sort happened here.  Plaintiff gave the name of a single candidate (Catterson) to a single law firm with an awareness that the firm was looking for such a candidate, and only after that candidate's name was given to her by another candidate (Bosch).  Pillsbury immediately acknowledged receipt of Catterson's name and its interest in pursuing him; they were not "inundated" by unsolicited information.  And Plaintiff did not submit Catterson (either by name or as a blind profile) anywhere else.

have presented Bosch – at a minimum – to Pillsbury without a Fee Agreement in place, nor received its fee for Bosch's placement absent such an agreement.  *See* Compl. ¶¶ 44-46.

Furthermore, the Complaint adequately alleges facts from which it can be inferred that Defendant had "some knowledge" of the Fee Agreement.  Plaintiff alleges that "the Fee Agreement is a boilerplate document commonly used by Pillsbury in its relationships with legal recruiters," and that "if there exists a fee agreement between Pillsbury and MLA, it would be substantively identical to the Fee Agreement between Pillsbury and Plaintiff."  Compl. ¶¶ 25, 26. This must be accepted as true for the purposes of this motion to dismiss, and is adequate to defeat Defendant's claim to the contrary.[6]

And, if Defendant genuinely did not have knowledge of the terms of Plaintiff's contract with Pillsbury, then it would ineluctably lead to the conclusion that Defendant itself did not have a contract with Pillsbury, and thus no entitlement whatsoever to the Catterson Fee that it is

---

[6] Defendant argues that "Jordan's Ladder fails to show (with anything other than vague and conclusory allegations) that MLA (or Mullman) knew of the terms of the contract."  MTD at 16. This is incorrect – the Complaint sufficiently alleges that Defendant knew or should have known the terms of the contract – but alleging such knowledge is unnecessary and it misstates the standard to demand anything more than that Plaintiff plead that Defendant had "some knowledge" of the terms of the contract.  *See State St. Glob. Advisors*, 431 F. Supp. 3d at 349.

Defendant further takes issue with Plaintiff's assertion "upon information and belief" that any agreement between Pillsbury and Defendant would likely be the substantively identical boilerplate as the agreement between Pillsbury and Plaintiff, arguing that "any claim offered upon 'belief' is by definition not factual."  MTD at 16.  But allegations "upon information and belief" regularly suffice to meet the *Iqbal*/*Twombly* pleading standard.  *See, e.g.*, *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) ("The *Twombly* plausibility standard, which applies to all civil actions, does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible.") (citing *Twombly*, 550 U.S. at 556; *Iqbal*, 556 U.S. at 678-79).

15

seeking.  As is apparent from the face of the Fee Agreement between Plaintiff and Pillsbury,

Pillsbury uses a boilerplate fee agreement for its dealings with legal recruiters, with the name of

the search firm left blank; this Court can reasonably infer that Pillsbury would use the same

agreement with MLA as it did with Jordan's Ladder.  Compl. ¶¶ 25, 26.  Thus either Defendant

knows the terms of the Fee Agreement, and its argument on this point is logically defeated, or it

does not have a comparable agreement with Pillsbury, and thus is logically precluded from

claiming the Catterson Fee.  (Indeed, this is the very gravamen of Plaintiff's entire claim:  that

Defendant has persisted in seeking the Fee despite knowing that it has no contractual right to it.)

      3.  <u>The Complaint Sufficiently Alleges Pillsbury's Breach</u>

Defendant next argues that Plaintiff fails to allege breach of contract, because Pillsbury,

in putting the Catterson Fee in escrow, has not actually breached the contract.  This is a twisted

interpretation of the facts of this case, for multiple reasons, and accepting this illogic would

allow Defendant to use its own tortious conduct as a sword and a shield.  It must be rejected.

The Complaint clearly pleads the third element of a tortious interference claim, namely

that "plaintiff must allege facts showing that "the defendant's objective was to procure such a

breach."  *Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 3d 318, 327–28 (S.D.N.Y.

2017).  As set forth in the Complaint, not only was it Defendant's objective here to procure a

breach – *i.e.*, by importuning Pillsbury to pay the Catterson Fee to Defendant rather than Plaintiff

– but they would have gotten away with it, too, were it not for Plaintiff's own timely

intervention.  In other words, had Plaintiff not threatened to bring (and ultimately brought) this

lawsuit, Pillsbury was – as the Complaint sets out – prepared to pay the entirety of the Catterson

Fee to Defendant, which would manifestly have been a breach of its Fee Agreement with

Plaintiff.  *See* MTD at 19 ("Pillsbury told Jordan that it intended to pay the Catterson Placement

Fee to MLA.") (citing Compl. ¶ 46).  *If* Pillsbury performed the agreement properly by escrowing the Catterson Fee – which Plaintiff disputes, *see infra* – it was only because Plaintiff stepped in to ensure that Pillsbury (at a minimum) did so, and that does nothing to change the fact that it was Defendant's objective to a procure a breach.[7]

Putting that aside, only a highly technical reading could lead to the conclusion that Pillsbury's putting the Catterson Fee in escrow does not amount to a "breach" within the meaning of a tortious interference claim.  Plaintiff bargained with Pillsbury for a certain commission if a condition precedent was met.  Plaintiff, as alleged, met that condition, and thus was entitled to the benefit of its bargain with Pillsbury.  But Plaintiff has not received that benefit, because Defendant has interfered and staked a claim to the Fee without any basis.  The technical argument that Plaintiff received the benefit of its bargain because Pillsbury escrowed the Catterson Fee in the face of a meritless competing claim from MLA should not be given priority over the fact that Plaintiff has yet to receive the Catterson Fee, and has had to instigate litigation in order to obtain it.

Furthermore, the Complaint alleges facts from which it can be concluded that Pillsbury *was* in breach, *i.e.*, that Pillsbury did not behave as it was supposed to under the Fee Agreement. The Fee Agreement provides that "if Pillsbury receives a candidate's resume for more than one source, the resume which was received first . . . will be deemed to be the first resume received by Pillsbury, and only that source will be eligible for a placement fee (if applicable).  Pillsbury will deem that resume to be the exclusive referral of Search Firm for six months from initial receipt of the resume."  Compl. ¶ 24.

---

[7] At a minimum, Plaintiff's claim should be allowed to go forward because Plaintiff suffered damages in preventing Defendant from succeeding in its attempt to induce Pillsbury's breach, in the form of attorneys' fees and related litigation expenses.  *See infra* at 21.

The Complaint alleges that Pillsbury was fully aware, from at a minimum January 13 through January 26 of 2021, that it had received Catterson's resume, that it was treating Plaintiff as the recruiter of record for Catterson, and that neither MLA nor Mullman had been involved with the process whatsoever.  Compl. ¶ 41.  For Pillsbury to have placed the funds in escrow, thereby giving credence to MLA's belated claim that it in fact had title to the Catterson Fee, indeed *does* place Pillsbury in breach of its obligations under the Fee Agreement:  either Plaintiff had successfully presented Catterson by that point and earned the Fee, or Plaintiff had done so without Catterson's permission and thus had not earned the Fee, but in either event the exclusivity provision would preclude *Defendant* from being entitled to the Fee.  From these facts as alleged in the Complaint, Plaintiff could have stated a claim for breach of contract against Pillsbury, whether directly or sounding in the covenant of good faith and fair dealing.

Defendant contends that "Pillsbury has not breached the Fee Agreement, rather it is adhering to the actual terms of the Fee Agreement, by placing the placement fee in escrow until such time as Jordan's Ladder reaches such an agreement on fee percentages."  MTD at 17.  But the Fee Agreement, which was attached to the Complaint, makes no mention of placing funds in escrow, only that it is the obligation of the contracting search firm – *i.e.*, Plaintiff, rather than Pillsbury – "to negotiate directly with any other search firm claiming a right to the payment of a placement fee[.]"  Compl. ¶ 24.  The fact that Pillsbury has *sua sponte* decided to place the Catterson Fee into escrow does not automatically afford them the protections that a properly designated escrow agent would have, nor does it absolve them of responsibility for abiding the terms of the contract.

4.  <u>The Complaint Sufficiently Alleges that MLA's Interference Was Intentional and Unjustified</u>

The Complaint also adequately alleges the next element of a tortious interference claim, namely that Defendant intentionally induced Pillsbury's breach and did so without justification. To wit, the Complaint alleges that, by facilitating and accepting the steps taken by Jordan to present Catterson as a candidate to Pillsbury – culminating in the January 25 interview – Pillsbury was treating Plaintiff as Catterson's recruiter.  *See* Compl. ¶ 41 ("[B]y communicating with Jordan regarding Catterson, Pillsbury treated Plaintiff as the recruiter of record for Catterson for (at a minimum) the entire period from January 13, 2021 to January 26, 2021."). Thus, "at that point, there was <u>no</u> additional work to be done by Plaintiff to present Catterson as a candidate to Pillsbury," Compl. ¶ 42, and Plaintiff was entitled to receive the Catterson Fee if Catterson ultimately joined Pillsbury, which of course he did.  Compl. ¶ 49.

The Complaint further alleges that Defendant – a legal search firm, acting through Mullman, an experienced legal recruiter – would have been fully aware of industry standards regarding the awarding of a placement fee only to the first recruiter who presents a candidate, as documented in the boilerplate Fee Agreement.  Compl. ¶¶ 23-26; *see also* Compl. ¶ 7 (Defendant "knew that Plaintiff has and had a contractual agreement with [Pillsbury] entitling Plaintiff to the fee, yet [Defendant], acting through its agent Mullman and others, wrongfully staked a claim to the fee and . . . continues to maintain such claim.").  The Complaint also sets forth in detail the manner in which Mullman attempted to threaten Jordan to back away from her entitlement to the Catterson Fee, and threatened to interfere with her entitlement under the Fee Agreement to the Bosch Fee, as well.  Compl. ¶ 48; *see also* Compl. ¶¶ 44-46 (describing discussions between Jordan, and Bosch, Catterson, and Pillsbury regarding MLA's claim to the Catterson Fee).

Defendant contends that its tortious interference is excused by the economic interest doctrine, which allegedly "bars an action for tortious interference" where a defendant had a preexisting legal or financial interest in the business of the third party and "acted to protect its own legal or financial stake in the breaching party's business."  MTD at 18 (citing *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.,* 259 F. Supp. 3d 16, 29-30 (S.D.N.Y. 2017).  The Complaint, however, plainly alleges that Defendant's interference was improper and unjustified, creating (at most) a triable issue of fact that cannot be resolved as a matter of law, and certainly not at this stage of proceedings.

Moreover, based on the facts pled in the Complaint, the economic interest doctrine is inapplicable here, as MLA did not have "a legal or financial stake in [Pillsbury's] business," and MLA does not offer any facts to the contrary.  MLA is a rent-seeking third-party, trying to obtain a benefit from Pillsbury for its (alleged) contribution to Pillsbury's hiring of Catterson.  MLA and Pillsbury – like Plaintiff and Pillsbury – have (at most) a relationship of arm's-length contractors; MLA is not a subsidiary or joint venturer or creditor of or with Pillsbury, nor does it claim in its motion that it is, either.[8]

---

[8] MLA acknowledges this, and offers the curious argument that it was justified in acting to induce breach of Pillsbury's contract with Plaintiff because MLA had a preexisting economic relationship *with Catterson*.  MTD at 20 ("MLA (specifically Mullman) had a pre-existing economic relationship with Catterson, the very person that Jordan's Ladder claims to represent. MLA did not have a generalized economic interest in representing Catterson, it had a specific and individual prior business relationship with him and acted at his request.").  None of the cases cited by Defendant, however, stand for the proposition (or give the barest suggestion) that this subjective view is what the economic interest doctrine is meant to address.  If it did, of course, the exception would swallow the rule, and any search firm that had a client leave to be represented by another firm would be able to interfere with the new firm's efforts on behalf of that client with impunity.  The fact that *Catterson* may not have understood how fee agreements work in the legal search field (and thus sought to have Mullman credited as his recruiter) is one thing; the idea that Mullman and MLA did not understand this is beyond plausibility.

5.  The Complaint Alleges that Plaintiff Was Damaged by Defendant's Tortious Interference

Lastly, the Complaint provides sufficient allegations to support the final element of a claim for tortious interference, namely that Plaintiff was damaged by Defendant's conduct.[9] First, Plaintiff alleges that it was damages by virtue of not receiving the $375,000 to which it was entitled under the Fee Agreement for presenting a successful lateral candidate, Catterson, to Pillsbury.  Compl. ¶¶ 53, 54, 70-72.  Second, the Complaint sets forth the various ways in which Defendant's conduct was egregious and unjustified, thereby entitling Plaintiff to punitive damages as well.  Compl. ¶ 73; *see also* Compl. ¶¶ 44-46 (describing Defendant's willful and intentional inducement of Pillsbury's breach); ¶ 48 (describing Mullman's threatening phone call).  Third, the Complaint sets forth that Plaintiff has been damaged in expending legal fees and costs to commence this action, and as described above in intervening to mitigate the effect of Defendant's inducement of Pillsbury's breach (which resulted in Pillsbury escrowing the funds rather than paying them directly to MLA, as had been Pillsbury's intention).  Compl. ¶ 74; *see also supra* at 16-18 & n.7.

**D.  Plaintiff's Claim for a Declaratory Judgment Presents a Live Issue for Resolution Irrespective of Whether Plaintiff's Claim for Tortious Interference Is Dismissed**

Plaintiff's claim for declaratory relief is properly before this Court if it presents a dispute that is "real, definite, substantial, and sufficiently matured so as to be ripe for judicial determination."  *AB Oil Servs., Ltd. v. TCE Ins. Servs., Inc.*, 133 N.Y.S.3d 638, 642 (2d Dep't 2020).  "[T]he standard for ripeness in a declaratory judgment action is 'whether . . . there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy

---

[9] Although Defendant's motion papers do not contest that Plaintiff was damaged, Plaintiff provides this brief summary in the interest of clarity and for the avoidance of doubt.

and reality to warrant the issuance of a declaratory judgment." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 295 (S.D.N.Y. 2003).

The Complaint unmistakably pleads facts sufficient to establish that there is a ripe dispute before this Court. Plaintiff and Defendant have adverse interests, grounded in law, with respect to title to the substantial ($375,000) Catterson Fee currently sitting in escrow. Plaintiff alleges both that it has undertaken to perform all of its obligations that entitle it to the Fee, and that Defendant has staked its own claim to the Fee as well. There is no foreseeable path to resolution absent a judicial determination as to which party has proper or superior claim to the Fee in dispute.

The sole argument that Defendant advances to seek dismissal of Plaintiff's declaratory judgment claim is unavailing. Defendant contends that the claim for declaratory judgment should be dismissed on the supposed basis that in order to "determin[e] that Jordan's Ladder and not MLA is entitled to receive the entirety of the Catterson placement fee . . . the Court would have to consider issues at the core of this dispute . . . which would be duplicative of Plaintiff's other claim for tortious interference[.]" MTD at 21. This is simply wrong. The case that Defendant cites stands for the uncontroversial proposition that a declaratory judgment is duplicative of substantive claims *if* it concerns issues that "will, of necessity, be resolved in the course of the litigation of the other causes of action." *Matthew v. RCN Corp.*, No. 12 CIV. 0185 JMF, 2012 WL 5834917, at *8 n.8 (S.D.N.Y. Nov. 14, 2012). But that does not mean that all substantive claims "will, of necessity" resolve duplicate issues underlying a declaratory judgment claim, and it is not the case here.

The gravamen of Plaintiff's declaratory judgment claim, as pled in the Complaint, is the following: "Plaintiff, and not MLA, was the first firm to present Catterson to Pillsbury as a

candidate.  Pursuant to the Fee Agreement, Plaintiff, and not MLA, is therefore entitled to receive the entirety of the Catterson Placement Fee."  Compl. ¶¶ 59, 60.  Assume for the sake of argument that this Court found that MLA *did not* tortiously interfere with Plaintiff's right to the Catterson Fee.  This Court could – if it were to accept Defendant's arguments – reach this conclusion for any one of a number of reasons.  But none would *necessarily* resolve the issue central to Plaintiff's request that the Court issue a declaratory judgment and fashion appropriate equitable relief:  whether Plaintiff or Defendant is *more entitled than the other* to the Catterson Fee, either in whole or in part.

For example, assume, again only for the sake of argument, that this Court dismissed Plaintiff's tortious interference claim because Pillsbury is not actually in breach.  What result?  By definition, Pillsbury would have acted properly in escrowing the Catterson Fee pending resolution of this dispute, but the live, justiciable dispute between Plaintiff and Defendant that is before this Court for declaratory judgment – *i.e.*, whether Plaintiff or Defendant is *more* entitled to the escrowed Fee, and in what percentage – would still remain live.  This same analysis can be applied to each of the other grounds upon which Defendant seeks dismissal.  Indeed, Plaintiff cannot think of any basis to conclude that any of Defendant's arguments would *necessarily* obviate the need for the claim for declaratory relief to be resolved – and Defendant's single paragraph on the topic certainly does not provide one.

Defendant's request that the Court dismiss Plaintiff's claim for declaratory relief should be denied.

**CONCLUSION**

For the reasons set forth herein, Plaintiff respectfully requests that this Court deny Defendant's motion to dismiss, both as to Plaintiff's first claim for relief (requesting a declaratory judgment) and as to Plaintiff's second claim for relief (tortious interference with contract).

Dated:  November 19, 2021
        New York, New York

LAW OFFICE OF DANIEL F. WACHTELL

By:    _____
            Daniel F. Wachtell
90 Broad Street, 23rd Floor
New York, New York 10004
(917) 667-6954
dan@danwachtell.com

*Attorneys for Plaintiff Jordan's Ladder Legal Placements, LLC*