USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/12/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————

JORDAN'S LADDER LEGAL
PLACEMENTS, LLC,

        Plaintiff,

    -against-                          No. 21 cv 7124 (CM)

MAJOR, LINDSEY & AFRICA, LLC,

        Defendant.

————————————————————————

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

McMahon, J.:

The instant action involves a dispute between two competing legal recruiting companies. Plaintiff Jordan's Ladder Legal Placements, LCC ("Ladder") brings this action against Defendant Major, Lindsey & Africa, LLC ("MLA") in connection with a fee agreement for the placement of lateral law firm partners. Plaintiff alleges that its principal spent over a year identifying a valuable and mutually beneficial lateral opportunity for a senior law firm partner and expected to be paid the placement fee that it had contracted for with that partner's new firm. Instead, Plaintiff alleges that Defendant MLA swooped in and – based solely on a preexisting relationship with the lateral partner – staked a baseless claim to the placement fee. Plaintiff brings this two-count action seeking (i) a declaration that Ladder (and not MLA) is entitled to the entire placement fee; and (ii) damages for tortious inference with contract. (*See* Dkt. No. 1 ("Compl.")).

Defendant moves to dismiss the Complaint on the grounds that (i) Plaintiff fails to state a claim for tortious interference with contract, and (ii) declaratory relief is duplicative of Plaintiff's claim for tortious interference with contract.

1

For the reasons stated below, Defendant's motion is granted in part and denied in part.

## BACKGROUND

### I.     Parties and Relevant Non-parties

Plaintiff Jordan's Ladder Legal Placements, LLC ("Ladder") is a New York limited liability company. (Compl. ¶ 9). No limited partner of Jordan's Ladder is a citizen of Maryland for diversity purposes. Ladder is in the legal recruiting business. Melissa Jordan is the principal of Ladder and has worked for nearly ten years a legal recruiter. Jordan specializes in high-end lateral partner placements at major law firms. (*Id*.).

Defendant Major, Lindsey & Africa, LLC ("MLA") is a Maryland limited liability company with its principal place of business in Maryland. (*Id.* ¶10). None of its limited partners is a citizen of New York for diversity purposes. MLA is also in the business of legal recruitment. Lawrence N. Mullman is a legal recruiter and a partner in MLA's office in New York, New York. (Compl. ¶ 11).

There are three non-parties who have an interest in this lawsuit.

Non-party Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") is an international law firm with twenty locations worldwide. (Compl. ¶ 12)

Non-party William M. Bosch is a partner in Pillsbury's commercial litigation group and is based primarily in Washington, D.C. Mr. Bosch joined Pillsbury on or about April 30, 2021. (Compl. ¶ 13).

Non-party James M. Catterson is a partner in Pillsbury's commercial litigation group, based primarily in New York, New York. He joined Pillsbury on or about May 3, 2021. (Compl. ¶ 14.)

### II.    Factual History

A. *Ladder Identifies Pillsbury as a Lateral Opportunity for Bosch*

Beginning in September 2019, Bosch engaged Ladder's recruitment services and he and Jordan began discussing various lateral opportunities for Bosch to make a move to a different firm from the firm in which he was partner at that time. (Compl. ¶ 20). Jordan compiled a detailed spreadsheet and comprehensive analysis of the pros and cons of potential lateral moves to more than three dozen law firms to discuss with Bosch. (Compl. ¶ 21). Together, Jordan and Bosch identified Pillsbury as the best firm for Bosch. (*Id.* ¶ 22). Jordan contacted Pillsbury and informed the firm that she had commercial litigation partner candidate she wanted to present as a potential lateral hire. (*Id.*).

B. *Ladder and Pillsbury Execute the Fee Agreement*

On January 24, 2020, Pillsbury and Ladder executed Pillsbury's standard Attorney Search Firm Agreement (the "Fee Agreement") (*see* Complaint, Exhibit A). Jordan signed on behalf of Ladder, and Chares L. Curtis signed on behalf of Pillsbury. (*Id.* ¶ 23).

The Fee Agreement provides, in relevant parts that:

- "If a candidate presented by Search Firm is admitted as a partner of Pillsbury. . .. Pillsbury will pay Search Firm a fee equal to twenty-five percent (25%) of the candidate's annual base compensation or 6 estimated annual base profit participation (whichever is applicable) as of the date the candidate becomes a member of the Firm." (Fee Agreement ¶ 1(b)).

- "If Search Firm refers more than one candidate from the same law firm, agency or other organization as a 'group' or 'package,' the fee shall be the amount equal to twenty-five percent (25%) of the annual base compensation or estimated annual base profit participation (whichever is applicable) of the two (2) most highly compensated attorneys of the group hired." (Fee Agreement ¶ 1(d)).

- "Fees are payable within thirty (30) days of Pillsbury's receipt of invoice from Search Firm." (Fee Agreement,¶ 1(e)).

- "Every candidate, including each member of a 'group' or 'package', must give his/her **express permission, preferably in writing, to Search Firm** to submit his/her resume and any other information to Pillsbury." (Fee Agreement ¶ 2) (emphasis added).

- "If Pillsbury receives a candidate's resume from more than one source, **the resume which was received first. . .. will be deemed to be the first resume received by Pillsbury, and only that source will be eligible for a placement fee**. … Pillsbury will deem that resume to be the exclusive referral of Search Firm for six months from initial receipt of the resume (or for six months after the candidate's last interview with Pillsbury, whichever is later)." (Fee Agreement,¶ 2) (emphasis added).

- "In the event that more than one search firm claims the right to a placement fee for placement of a particular candidate or candidates . . . **it will be the obligation of Search Firm to negotiate directly with any other search firm claiming a right to payment of a placement fee and to reach an agreement** as to the percentage (if any) to be paid to each search firm." (Fee Agreement ¶ 2) (emphasis added).

    C. *Jordan Introduces Bosch to Pillsbury.*

On January 29, 2020, Jordan shared Bosch's name with Pillsbury and informed the firm that, as Bosch was in a leadership role at his then-current firm, he might be able to bring other partners with him. (Compl. ¶ 27).

On February 5, 2020, Bosch had an initial phone interview with a partner at Pillsbury; and on February 24 and 25, 2020, Bosch interviewed with additional Pillsbury partners. (*Id.* ¶ 28). Plaintiff alleges that it scheduled the interviews with Pillsbury on behalf of its candidate, Mr. Bosch. (*Id.*).

Shortly after Bosch's initial meetings with Pillsbury partners, COVID-19 plagued New York City and put hiring on pause. Ladder alleges that it did not have any additional substantive contract with Pillsbury regarding Bosch's candidacy until December of 2020. (*Id.* ¶ 29). On or about December 16, 2020, Jordan contacted Pillsbury's internal recruiting team on behalf of Ladder, in order to facilitate a conversation between Bosch and Deborah Baum, the head of Pillsbury's litigation group. (*Id.* ¶ 31).

In January 2021, Bosch spoke with Baum. (*Id.* ¶ 32). After the conversation Bosch mentioned to Jordan that Bosch had broached with Baum the possibility of bringing a colleague along with him to Pillsbury –James M. Catterson, a former Associate Justice of the New York

Supreme Court's Appellate Division, First Department. (*Id.*). Bosch asked that Ladder/Jordan not to reach out to Catterson until Bosch had confirmed both Catterson's interest in Pillsbury and his willingness to work with Ladder in connection with his possible lateral move. (*Id.*).

Jordan advised Bosch via email not to pass her contact info to Catterson unless Catterson wanted to discuss the Pillsbury opportunity with her. (*Id.* ¶ 33). Ladder alleges that Jordan did not want to interfere in the event that Catterson had already engaged another legal recruiter, and Jordan understood that Bosch did not want to interfere either. (*Id.*). Consistent with both Bosch's request and with industry custom, Jordan did not reach out directly to Catterson regarding the opportunity to lateral to Pillsbury with Bosch. (*Id.*).

On or around January 13, 2021, Bosch emailed Jordan to inform her of Catterson's availability for a meeting with Pillsbury, which Bosch asked her to arrange. (*Id.* ¶ 34). Plaintiff alleges that Jordan understood, both from Bosch's email and from subsequent communications with Bosch, that Catterson had expressly authorized her – rather than another recruiter – to submit information to Pillsbury in support of Catterson's candidacy. (*Id.*).

Jordan proceeded to arrange an initial meeting between Catterson and Pillsbury, for January 25, 2021. (*Id.* ¶ 35). As a prelude to the meeting, Pillsbury asked Jordan to provide Catterson with the firm's standard confidentiality forms. (*Id.* ¶ 36). Plaintiff alleges that Jordan sent the confidentiality forms to Bosch (presumably to pass along to Catterson), and that the next day Bosch returned the forms, which appeared to have been completed by Catterson. (*Id.* ¶¶ 36-37).

On January 25, 2021, Bosch and Catterson met with Pillsbury. (*Id.* ¶ 38). The next day Pillsbury sent Jordan "Lateral Partner Questionnaire" forms for both Bosch and Catterson to complete. (*Id.* ¶ 39). Jordan sent the forms for both men to Bosch. (*Id.*).

D.  *Defendant MLA's Involvement with Catterson*

On January 27, 2021 – two weeks after Bosch told Jordan that Catterson was available to interview at Pillsbury, and two days after Catterson's scheduled interview at that firm --  Catterson called Jordan and advised her that he was represented by legal recruiter Lawrence Mullman of MLA. (*Id.* ¶ 44). Jordan responded that this was inconsistent with the fact that Catterson had already interviewed with Pillsbury -- a meeting that Jordan had coordinated with Catterson's permission. (*Id.*).

Later that day, Jordan spoke with Bosch, at which point Bosch asked Jordan to consider splitting the fee Ladder stood to receive in connection with Catterson's placement (the "Catterson Fee") with MLA. (*Id.*). Plaintiff alleges that Jordan explained to Bosch that any such placement fee was due to her firm (Ladder), and not to MLA, but said she would consider Bosch's request as a professional courtesy. (*Id.*).

On January 29, 2021, Pillsbury called Jordan and informed her that Pillsbury intended to pay the Catterson Fee to MLA, suggesting that Plaintiff work out a deal with MLA to split the fee between the two recruitment firms, and representing that Pillsbury would be willing to "strongly encourage" MLA to split the fee with Plaintiff Ladder. (*Id.* ¶ 46). Plaintiff alleges that, during that call, Jordan communicated to Pillsbury that the firm's decision to pay the fee to MLA would directly contravene the terms of the Fee Agreement. (*Id.*).

On February 2, 2021, Jordan received a voicemail message from Mullman of MLA, in which he stated that Pillsbury had asked him to reach out to her. (*Id.* ¶ 47). The next day Jordan called Mullman and recorded the conversation. (*Id.* ¶ 48). During the call, Mullman stated that he was representing Catterson in connection with the Pillsbury lateral opportunity and insisted that he was entitled to 100% of the Catterson Fee on behalf of MLA. (*Id.*). Jordan maintained that

Plaintiff Ladder would keep the entire Bosch Placement Fee. She also said that, even though Ladder was also entitled to the entirety of the Catterson Fee under, she was willing to engage in a reasonable discussion with Mullman about MLA receiving a portion of the fee in the interest of compromise. (*Id.*). Plaintiff alleges that, in response, Mullman stated that neither he nor Pillsbury would ever permit Ladder to keep the entire Bosch fee *and* a portion of the Catterson Fee. Mullman threatened that, if Jordan persisted in seeking both fees on behalf of Ladder, Catterson and Bosch "will go elsewhere rather than see that happen and you'll end up with nothing." (*Id.*).

E. *Bosch and Catterson Join Pillsbury*

Around April 2021, Jordan learned from a telephone call from Pillsbury that Bosch and Catterson would be joining Pillsbury as partners on April 30, and May 3, 2021, respectively. (*Id.* ¶ 49). Plaintiff alleges on the same call, Jordan also "learned that Pillsbury would be paying a placement fee of $375,000 for each candidate." (*Id.*) Plaintiff does not allege whether Pillsbury specified to whom those fees would be paid.

On or about May 3, 2021, Plaintiff submitted to Pillsbury an invoice for $375,000 for the fee for the placement of Bosch and an invoice for $375,000 for the fee for the placement of Catterson. (*Id.* ¶ 50). Plaintiff's invoices specified that payment of each of the placement fees was due within 30 days – by June 2, 2021. (*Id*. ¶ 51)

By email dated June 16, 2021, Charles Curtis, on behalf of Pillsbury, informed counsel for Plaintiff that he had "been authorized to process a payment to [Plaintiff] in the amount of $375,000 for the placement of Bill Bosch." (*Id.* ¶ 52). Plaintiff received that payment on or about June 18, 2021. (*Id.*).

But in the same June 16 email, Curtis further informed counsel for Plaintiff that Pillsbury would be "holding the fee on James Catterson in a trust account pending notification from both

parties that the dispute between MLA and [Plaintiff] has been resolved." (*Id.* ¶ 53). To date, Plaintiff has not received payment. (*Id.* ¶ 54).

Plaintiff filed the instance action on September 24, 2021. Defendant moved to dismiss on October 26, 2021. For the reasons discussed below, Defendant's motion is denied.

**LEGAL STANDARD**

In order to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To achieve "facial plausibility," a claim must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). To survive a motion to dismiss, the plaintiff must allege facts that "nudge[] [plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Further, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (internal citations omitted).

"In determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated into the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991). The court may consider the full text of documents that are cited in, incorporated by reference in, or "integral" to the complaint. *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 809 (2d Cir. 1996).

**DISCUSSION**

Defendant moves to dismiss Plaintiff's Complaint on the grounds that (i) Plaintiff fails to state a claim for tortious interference with contract; and (ii) Plaintiff's claim for declaratory relief is duplicative of its claim for tortious interference with contract. (See Defendant's Memorandum of Law in Support of its Motion for Summary Judgement, Dkt. No. 10-4 ("Mot.")).

I.       **The Motion to Dismiss Plaintiff's Tortious Interference Claim is Denied.**

Count II asserts that MLA tortiously interfered with the Fee Agreement between Plaintiff and Pillsbury. Plaintiff alleges that MLA was aware of the existence of the Fee Agreement at all relevant times. (Compl. ¶ 66). Notwithstanding that knowledge, MLA intentionally and improperly facilitated Pillsbury's breach of the Fee Agreement – without justification – by staking a knowingly baseless claim to the Catterson Fee. (*Id*. ¶¶ 67-68). Pillsbury then breached the Fee Agreement by putting the Catterson Fee in a trust, rather than paying that fee to Plaintiff by June 2, 2021, as required by the Fee Agreement. (*Id*.). Plaintiff alleges that the purported breach would not have occurred but for MLA's interference. (*Id*.). As a result of MLA's tortious interference with the Fee Agreement, Plaintiff claims to have suffered damages in the amount of $375,000 (exclusive of interest and costs). (*Id.* ¶ 71).

To plead a claim for tortious interference with contract under New York law, Plaintiff must demonstrate "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (citing *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)). Defendant argues that Plaintiff fails to adequately plead the first four elements of tortious interference with contract. (*See* Mot. at 13-21).

Defendant moves to dismiss Count II on the grounds that (i) there was never a valid contract between Plaintiff and Pillsbury because a condition precedent to contract formation was unmet; (ii) Defendant was not fully aware of the terms of the Fee Agreement; (iii) Pillsbury was not technically in breach of the Fee Agreement because placing the Catterson Fee in escrow was proper performance under the circumstances; and (iv) Defendant justifiably acted in defense of its own economic interest if it did interfere with the contract between Plaintiff and Pillsbury, and thus has a complete defense to a tortious interference claim. Defendant does not contest that Plaintiff properly alleges damages.

i.   <u>Plaintiff adequately alleges the existence of a valid contract between it and a third party (Pillsbury).</u>

Defendant contends that "there was no binding contract, because Jordan's Ladder lacked permission to represent Catterson in Pillsbury's recruitment." (Mot. at 15). Defendant's argument is that no contract between Plaintiff and Pillsbury exists because Catterson's express consent to Ladder's representation of him was a condition precedent to the contract. In relevant part, the Fee Agreement provides that every candidate "must give his/her express permission, preferably in writing, to Search Firm to submit his/her resume and any other information to Pillsbury." (Fee Agreement ¶ 2).

But on the facts pleaded, it is a fair inference that Catterson did expressly consent to being represented by Ladder – which would mean there was a valid and binding contract between Plaintiff and Pillsbury in relation to the fee for Catterson's placement.

The Complaint sets forth the following allegations, which are presumed true for purposes of this motion: Bosch informed Jordan that Catterson might be interested in joining Pillsbury with him; Bosch asked Jordan not to reach out to Catterson directly; Bosch then served as an

intermediary, conveying information back and forth between Jordan and Catterson; Catterson never indicated, directly or through Bosch, that he was working with another recruiter; both the Pillsbury confidentiality and Lateral Partner Questionnaire forms that Jordan provided for Catterson's signature came back to Jordan, filled in and signed, apparently by Catterson; Jordan gave Pillsbury Catterson's name with his knowledge; Jordan provided Pillsbury with relevant documents that Catterson had (apparently) completed; and Jordan scheduled the January 25, 2021, meeting for Catterson with Pillsbury – a meeting that, as far as we know at this early stage of litigation, Catterson attended.  (*See generally* Compl. ¶¶ 31-41).

The Complaint further alleges that the steps that Jordan took to present Catterson as a candidate to Pillsbury satisfy the industry standard for "presenting" a partner-level candidate as a lateral hire to a new firm: "A partner-level candidate is considered to be presented, and to be exclusively presented by a specific recruiter, when that recruiter gives the individual's name to the law firm with the individual's authorization." (Compl. ¶ 41.) Plaintiff argues that Catterson – via Bosch – gave Jordan permission to give his name to Pillsbury and schedule his interview, and Jordan did so, thus satisfying any "condition precedent" that Defendant alleges to be lacking.

In light of these allegations, whether a contract existed between Pillsbury and Plaintiff relating to Catterson is not an issue that can be resolved on a motion to dismiss.

Viewing the facts in a light most favorable to Plaintiff, as I am required to do at this stage, it is plausible that Catterson expressly consented to be represented by Ladder, and that he interacted with Jordan through Bosch. Moreover, it is plausible that Catterson himself signed Pillsbury's forms, which were provided to Bosch by Jordan – a fact that, if true (and it is presumed true on this motion to dismiss), admits of an inference that he wished to be represented by Ladder and by his conduct expressly consented to that representation.  Indeed, while Plaintiff argues that Bosch

had the power to bind Catterson to be represented by Jordan's Ladder, if Catterson himself signed the Pillsbury forms that were provided to him by Jordan and then attended the meeting that Jordan arranged, it would indicate his express consent to the representation - not consent via an agent, such as Bosch.

Of course, if it turns out that Catterson was never given the forms by Bosch, or that someone other than Catterson signed the forms without his knowledge or consent, then Plaintiff may not have as potentially viable a claim. But on the facts pleaded, it is plausible that Jordan and Pillsbury's Fee Agreement reached the Catterson placement.

        ii.    <u>Plaintiff adequately alleges MLA's knowledge of the Fee Agreement contract.</u>

Next, Defendant argues that Plaintiff fails to show that MLA knew of the terms of the contract. According to MLA, "knowledge of the terms of a contract is one of the elements necessary for a plaintiff to prove in order to establish tortious interference with a contract." (Mot. at 16).

Plaintiff does not need to *prove* anything at this stage in the litigation; instead, Plaintiff need only *allege* that MLA had knowledge that the Fee Agreement existed. *Guy Carpenter & Co., LLC v. Lockton Re, LP*, No. 10 CIV. 4932 CM KNF, 2010 WL 4449048, at *4 (S.D.N.Y. Nov. 4, 2010) (citing *Lama Holding Co. v. Smith Barney Inc*., 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (N.Y.1996)). Additionally, Plaintiff is not required to plead that MLA "had perfect or precise knowledge of the terms and conditions of the contracts in issue." *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 741, 775 (S.D.N.Y. May 18, 1990) (citing *Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp.*, 50 N.Y.2d 183, (May 1, 1980)).

Instead, under New York law, "a defendant need not be aware of all the details of a contract," but "it must have actual knowledge of the specific contract that is the subject of the claim." *Medtech Prods*., 596 F. Supp. 2d 778, 796 (S.D.N.Y. Sept. 30, 2008).

To state a claim for tortious interference with the Fee Agreement, Plaintiff need only allege that MLA knew of the existence of the contract, and at most "some knowledge" of its terms and conditions. *State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 349 (S.D.N.Y. Jan. 3, 2020). But "perfect or precise knowledge is not required." (*Id*.).

Plaintiff alleges that MLA, either directly or through its agent Mullman, (a) knew that Jordan had a contract with Pillsbury before and while it interfered with the contract; and (b) knew or should have known the general terms and conditions of that contract. Specifically, Plaintiff pleads that Jordan conveyed to Mullman, during their February 3, 2021, conversation, the fact that there was a contractual agreement between Plaintiff and Pillsbury and that it covered the Catterson representation. (Compl. ¶ 48). Moreover, the court can infer from the facts pleaded that Defendant MLA, a preeminent legal search firm, would have been well aware that Plaintiff Ladder, also a legal search firm, would not have presented Bosch (at a minimum) to Pillsbury without a Fee Agreement in place. (*See* Compl. ¶¶ 44-46.)

The Complaint also includes factual allegations from which it can be inferred that Defendant MLA had *at least* "some knowledge" of the Fee Agreement. Plaintiff alleges that "the Fee Agreement is a boilerplate document commonly used by Pillsbury in its relationships with legal recruiters," and that "if there exists a fee agreement between Pillsbury and MLA, it would be substantively identical to the Fee Agreement between Pillsbury and Plaintiff." (Compl. ¶¶ 25, 26).

Defendant MLA is correct that, "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth. *Iqbal*, 129

13

S.Ct. at 1949. And "bare allegations, devoid of allegations of specific conduct, are merely conclusory, and '[c]conclusory allegations are insufficient to survive a motion to dismiss.'" *Banco Indus. De Venezuela, C.A. v. CDW Direct, LLC*, 888 F.Supp.2d 508, 514-15 (S.D.N.Y. 2012). But the Complaint is not devoid of allegations of specific conduct: Plaintiff specifically alleges that Jordan told Mullman on the phone that Plaintiff and Pillsbury had entered into the Fee Agreement pursuant to which Ladder was entitled to payment.

Despite being told this, Mullman allegedly stated he would never permit Plaintiff to keep the entire Bosch Placement Fee while also receiving a portion of the Catterson Fee. (Comp. ¶ 48). He threatened that, if Jordan persisted in seeking both fees, Catterson and Bosch "will go elsewhere rather than see that happen and you'll end up with nothing" (*Id.*). Thereafter, Pillsbury refused to pay the Catterson placement fee to Jordan's Ladder. Taken together and viewed most favorably to Plaintiff,  these allegations of fact are sufficient to raise the inference that MLA had actual knowledge of the Fee Agreement. *Cf. Kirch v. Liberty Media Corp*., 449 F.3d 388, 402 (2d Cir. 2006) (finding actual knowledge of contract adequately pled where plaintiff alleged that it "had a contract with [a specified third party], of which the Defendants were aware, concerning the design and implementation of [a project]").

Defendant argues that, per the pleadings, MLA became aware of the existence of the Fee Agreement between Ladder and Pillsbury only after Jordan and Mullman spoke on the phone, by which time MLA had already been discussing with Catterson his plans to lateral to Pillsbury.  That fact, if true, might impact Plaintiff's right to recovery. But that fact is not pleaded in the Complaint, nor it is apparent from the Complaint – it is a fact raised in defense, which is not a fact that can be considered on a motion to dismiss a complaint for failure to state a claim. Moreover, Plaintiff argues that, whenever MLA became aware of Plaintiff's contract with Pillsbury (a fact that cannot

be ascertained at this moment), MLA's interference with the Fee Agreement continued after Mullman was told about the contract: the "gravamen of Plaintiff's entire claim" is "that Defendant persisted in seeking the Fee despite knowing that it has no contractual right to it." (Opp. at 15-16).

The allegations in the Complaint raise a plausible inference that MLA was aware of the existence of the Fee Agreement at the time it interfered with Plaintiff's contract with Pillsbury. The pleadings must be accepted as true for the purposes of the instant motion to dismiss and are adequate to defeat Defendant's claim to the contrary.  After discovery, MLA will undoubtedly renew this argument if it makes a motion for summary judgment.

        iii.    <u>Plaintiff adequately alleges that Defendant intentionally procured Pillsbury's breach of the Fee Agreement without justification.</u>

To state a tortious interference with contract claim, Plaintiff must also allege that Defendant intentionally procured Pillsbury's breach of the contract without justification. *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 767-68 (2d Cir. 1995); *see also Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 3d 318, 327-28 (S.D.N.Y. June 9, 2017) ("a plaintiff must allege facts showing that the defendant's *objective* was to procure ... a breach.") (quotation omitted).

Defendant contends that any interference by it with the Pillsbury-Jordan's Ladder contract is excused by the economic interest doctrine, which, according to MLA, "bars an action for tortious interference" where a defendant had a preexisting legal or financial interest in the business of a third party and "acted to protect its own legal or financial stake in the breaching party's business." (Mot. at 18) (citing *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 29-30 (S.D.N.Y. 2017)).

New York courts have developed the "economic interest defense" in an effort to strike a balance between two valued interests: "protection of enforceable contracts," and "promotion of

15

free and robust competition in the marketplace." *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 29 (S.D.N.Y. 2017), *aff'd,* 712 F. App'x 85 (2d Cir. 2018).

In *White Plains Coat & Apron Co., Inc. v. Cintas Corp*., 867 N.E.2d 381, 383 (2007), the New York Court of Appeals explained that the purpose of the economic interest defense is to enable a defendant to claim that it "acted to protect its own legal or financial stake in the *breaching party's* business." *Id*; *see also Don King Prods., Inc. v. Smith*, 47 Fed. Appx. 12, 15 (2d Cir. 2002) (summary order) (economic interest defense is available when the defendant "was acting [ ] to protect *its own economic interest* in that breaching party") (emphasis in original). The *White Plains* Court provided a non-exhaustive list of contexts in which the economic interest defense has applied: "where defendants were significant stockholders in the breaching party's business; where defendant and the breaching party had a parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff." *White Plains*, 867 N.E.2d at 383–84. But "mere status as plaintiff's competitor is not a legal or financial stake in the breaching party's business that permits defendant's inducement of a breach of contract." *Id*. at 384. Indeed, the economic interest defense does not apply where the defendant is a competition of the plaintiff "because this role does not entail a 'legal or financial stake in the breaching party's business that permits defendant's inducement of a breach of contract.'" *Benihana*, 259 F. Supp. 3d at 30 (quoting *White Plains*, 867 N.E.2d at 384).

It is entirely possible that MLA had a prior agreement with Catterson to represent him, which would give MLA an economic interest that it could perhaps assert as a defense to the tortious interference claim (*See* Mot. at 20) ("MLA (specifically Mullman) had a pre-existing economic relationship with Catterson. . .. [MLA] had a specific and individual prior business relationship

with him"). But that defense is not apparent from the face of the complaint (nor could it be). The economic interest "defense" is precisely that – a defense, which is by definition raised in an answer. A fact-based defense cannot be adjudicated on a motion for failure to state a claim in the complaint. "Several courts in the Second Circuit have refused to apply the economic interest defense at the pleading stage to dismiss complaints for tortious interference with contract, explaining that the facts of the pleadings were not sufficiently developed to show entitlement to the defense." *Hildene Capital Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*, No. 1 l-cv-5832 (AJN), 2012 WL 3542196, at *9 (S.D.N.Y. Aug. 15, 2012); *see also N. Shipping Funds I, L.L.C v. Icon Capital Corp.*, No. 12-cv-3584 (JCF), 2013 WL 1500333, at *5 (S.D.N.Y. Apr. 12, 2013) (finding it "improper for the Court to make a determination at [the motion to dismiss stage] as to the economic interest defense").

Moreover, it is far from clear that MLA's agreement with Catterson gave it an economic interest in the business of the "breaching party" – which, in the context of this lawsuit, is Pillsbury, not Catterson. The economic interest doctrine applies only to a defendant's interest in the *breaching* party. Indeed, "a party acting in its own direct interest, rather than to protect its stake *in the breaching party*, may not raise the economic interest defense." *UMG Recordings, Inc. v. Escape Media Grp., Inc.,* 37 Misc.3d 208, 948 N.Y.S.2d 881, 893 (N.Y.Sup.Ct.2012) (emphasis added)*, rev'd on other grounds,* 107 A.D.3d 51 (N.Y. App. Div. 2013). The parties have not adequately briefed whether MLA's interest in the Catterson transaction would bring it within the economic interest defense; I expect that matter, too, will be the subject of a motion later in this case.

### iv.    Plaintiff adequately alleges an actual breach of the Fee Agreement.

Finally with respect to Plaintiff's tortious interference with contract claim, MLA argues that Plaintiff fails to allege any actual breach of the Fee Agreement. Specifically, MLA asserts

that, by putting the Catterson Fee in a trust, Pillsbury did not breach the Fee Agreement; instead, Pillsbury's actions adhered to its obligations under the Fee Agreement. (Mot. at 16).

That, with respect, is absurd. The fee agreement requires Pillsbury to pay Plaintiff within thirty days for any placements arranged by Jordan's Ladder. It is undisputed that Pillsbury has not paid the Catterson placement fee to Plaintiff.  If Plaintiff is entitled to the fee pursuant to the Fee Agreement, then there has been a breach. A breach is thus adequately pleaded.

Pillsbury informed Plaintiff that it would be "holding the fee on James Catterson in a trust account pending notification from both parties that the dispute" had been resolved. (*Id.* ¶53). But that does not alter the fact that a breach was pleaded. The Fee Agreement provides that, "if Pillsbury receives a candidate's resume for more than one source, the resume which was received first . . . will be deemed to be the first resume received by Pillsbury, and only that source will be eligible for a placement fee." (Compl. ¶ 24) (citing Fee Agreement, Section 2). Moreover, the Fee Agreement further provides that "Fees are payable within thirty (30) days of Pillsbury's receipt of invoice from Search Firm." (Fee Agreement ¶ 1(e)). Plaintiff alleges that it sent Catterson's name to Pillsbury first – an allegation made plausible by the fact that Pillsbury provided Jordan, not Mullman, with non-disclosure forms for Catterson to fill out – and further alleges that Jordan's Ladder's invoice relating to Catterson, which was sent to Pillsbury around May 3, 2021, was not paid within thirty days and remains unpaid. (Compl. ¶ 50). The Fee Agreement does not say anything about placing funds in escrow. It says that fees are payable within thirty days. Plaintiff has pleaded a breach.

It is true that the Fee Agreement states that,  when competing claims to a placement fee arise, it is "the obligation of the Search Firm to negotiate directly with any other search firm claiming a right to payment of a placement fee and to reach an agreement as to the percentage (if

any) to be paid to each search firm." (Fee Agreement ¶ 2).  Defendant argues that this means that there was no breach by Pillsbury, because Plaintiff was obliged to negotiate until it reached an agreement with Defendant about how much of the fee each firm should collect.

But that is not correct. Per the Fee Agreement, Pillsbury was obligated to pay the fee to Plaintiff if Plaintiff presented Catterson first; and that obligation is not conditioned on any agreement between the parties. On the facts pleaded, there has been a breach. The fact that the competing firms were supposed to work it out but failed to do so does not excuse that breach.

The motion to dismiss Count II – tortious interference with contract – is denied.

## II.     The Motion to Dismiss the Declaratory Judgment Claim is Granted.

Count I of the Complaint seeks a declaration that Ladder, not MLA, is entitled to receive 100% of the Catterson Fee.

Under the Declaratory Judgment Act, 28 U.S.C. § 2201(a) (the "DJA"), a court "may declare the rights and other legal relations of any interested party seeking such a declaration" in "a case of actual controversy." An "actual controversy" exists if there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co*., 411 F.3d 384, 388 (2d Cir. 2005) (quoting *Md. Cas. Co*. *v. Pac. Coal & Oil Co*., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)). The disagreement must "have taken on a fixed and final shape so that a court can see what legal issues it is deciding." *Jenkins v. United State*s, 386 F.3d 415, 418 (2d Cir. 2004) (quoting *Public Serv. Comm'n of Utah v. Wycoff Co*., 344 U.S. 237, 244, 73 S.Ct. 236, 97 L.Ed. 291 (1952)).

The DJA provides:

In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations

19

of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a).

"[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937)). Because Article III of the Constitution authorizes federal courts to adjudicate only "cases" or "controversies," U.S. Const. Art. III, § 2, an "actual controversy must be extant" not just "at the time the complaint is filed," but throughout "all stages" of the litigation. *Alvarez v. Smith*, 558 U.S. 87 (2009). The controversy must at all times remain "definite and concrete, touching the legal relations of parties having adverse legal interests." *MedImmune*, 549 U.S. at 127 (quoting *Aetna Life Ins. Co*., 300 U.S. at 240–241). "Throughout the litigation, the party seeking relief must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *United States v. Juvenile Male*, —–U.S. —––, 131 S.Ct. 2860, 2864 (2011) (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)).

Defendant does not dispute the existence of an actual case in controversy warranting declaratory relief. Instead, Defendant argues that Plaintiff's claim for declaratory relief is duplicative of its claim for tortious interference with contract and should be dismissed for that reason. (*See* Mot. at 22) (citing *Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540 (S.D.N.Y. 2016)). Specifically, Defendant asserts that, in order to make such a declaration, the court would have to consider issues at the core of this dispute and those issues would be duplicative of Plaintiff's other claim for tortious inference by MLA with the Fee Agreement." (Mot. at 22).

Plaintiff's declaratory judgment claim is predicated on the following argument: "Plaintiff, and not MLA, was the first firm to present Catterson to Pillsbury as a candidate. Pursuant to the

Fee Agreement, Plaintiff, and not MLA, is therefore entitled to receive the entirety of the Catterson Fee." (Compl. ¶¶ 59, 60). The tortious inference claim hinges, not on Plaintiff's superior entitlement to the Catterson Fee, but on Defendant MLA's knowledge of the Fee Arrangement and intentional inducement of Pillsbury's breach of that agreement. So, for example, if this court were to find, after the close of discovery, that there is no evidence to support that MLA knew about the Fee Agreement, then the interference claim would be dismissed at the summary judgment stage. But that would not resolve the issue of which firm is entitled to the Catterson placement fee – it would simply resolve the collateral issue of tortious interference.

Moreover, success on its tortious interference with contract claim would entitle Plaintiff to *damages* suffered for *past* wrongful conduct; success on its declaratory judgment claim, on the other hand, would entitle Plaintiff to a *prospective* determination of its *right* to the Catterson Fee that might otherwise be denied. *See John Wiley & Sons, Inc. v. Visuals Unlimited, Inc*., 2011 WL 5245192, at *4 (S.D.N.Y. Nov. 2, 2011) (holding that declaratory relief is intended to operate prospectively," and therefore there "is no basis for declaratory relief where only past acts are involved.") (quoting *Nat'l Union Firs Ins. Co. of Pittsburg, Pa. v. Int'l Wire Grp., Inc*., 2003 WL 2127714, at *5 (S.D.N.Y. June 2, 2003)).

The problem with the declaratory judgment claim is not that it is duplicative of the tortious interference claim.  It is not.

The real problem with Count I is that the only case in controversy implicated by Plaintiff's claim for declaratory relief is a controversy between Ladder and *Pillsbury*. I suspect that Ladder brought Count I in an attempt to avoid suing Pillsbury, its once and (hopefully) future client, for breach of the Fee Agreement.  But Plaintiff cannot avoid suing its client to recover the fee it is owed pursuant to the Fee Agreement by the feint of asking for a declaratory judgment against

MLA. MLA does not owe plaintiff any money.  If it wants a declaration that Pillsbury owes it the Catterson Fee, then it needs to sue Pillsbury – not MLA.

"The existence of an actual controversy is an absolute predicate for declaratory judgment jurisdiction." *Spectronics Corp. v. H.B. Fuller Co., Inc*., 940 F.2d 631, 633 (Fed. Cir.), *cert. denied*, 502 U.S. 1013 (1991).  And a judiciable case in controversy "is one *between parties* having adverse legal interests, of sufficient immediacy and reality, to warrant the issuance of a declaratory judgment." *Gmurzynska v. Hutton*, 257 F. Supp. 2d 621, 631 (S.D.N.Y. 2003), *aff'd*, 355 F.3d 206 (2d Cir. 2004) (emphasis added) (quoting *Phoenix Mutual Life Ins. Co. v. Seafarers Officers & Employees Pension Plan*, 128 F.R.D. 25, 28 (E.D.N.Y.1989)).

Moreover, the court's discretion to enter a declaratory judgment should not be exercised "unless the court is satisfied that all persons who have an interest in the determination of the questions raised in the suit are before the court." *Robinson v. Comm'r of Jurors, New York Cnty*., 419 F. Supp. 1189, 1191 (S.D.N.Y. 1976) (citations omitted); *see Wilton v. Seven Falls Co*., 515 U.S. 277, 287 (1995) (the DJA "confers a discretion on the courts rather than an absolute right upon the litigant").  The court is not satisfied that all persons who have an interest in the determination of the question raised in Plaintiff's declaratory judgment claim are before this court, because Pillsbury is not before this court.  And Pillsbury is the party that owes Plaintiff money under Plaintiff's theory of the case.  And "where the remedy sought is a mere declaration of law without implications for practical enforcement upon the parties" – the parties actually named in this action – "the case is properly dismissed." *S. Jackson & Son v. Coffee, Sugar & Cocoa Exchange*, 24 F.3d 427, 431-432 (2d Cir.1994).

There is no case in controversy between the parties to this action and the court declines to exercise its permissive jurisdiction over Plaintiff's claim for declaratory relief.

Count I is dismissed.

## CONCLUSION

For the reasons discussed above, Defendant's motion to dismiss the tortious interference claim is denied, and the motion to dismiss the declaratory judgment claim is granted.

The Clerk of Court is respectfully directed to close the motion at Docket No. 10 from the court's list of open motions.  This constitutes a written opinion.

Dated: May 12, 2022

_____
                                    U.S.D.J.

BY ECF TO ALL COUNSEL