**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| JORDAN'S LADDER LEGAL PLACEMENTS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>MAJOR, LINDSEY & AFRICA, LLC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)   No.  21 Civ. 7124<br>)<br>)<br>)<br>)<br>)<br>) |

---

### **MAJOR, LINDSEY & AFRICA, LLC'S ANSWER TO COMPLAINT**

Defendant Major, Lindsey & Africa, LLC ("MLA"), in response to the Complaint

("Complaint") of Plaintiff Jordan's Ladder Legal Placements, LLC ("Jordan's Ladder"), states as

follows:

### **INTRODUCTION**

1.      This case is a straightforward dispute between two legal recruiters.  The first, Melissa Jordan of Jordan's Ladder, worked diligently over the course of more than a year to identify a valuable and mutually beneficial opportunity for a senior law firm partner – and, potentially, other members of his practice group – to make a lateral transfer from one firm to another.  Jordan's efforts successfully laid the groundwork for two partners to move to the new law firm in early 2021.

**ANSWER:**      Denied.

2.      By contrast, the second recruiter – Lawrence Mullman of MLA – did nothing of the sort.  Instead, he swooped in after Jordan's many months of work, once both of the partners had already interviewed with their new firm, and – based on nothing more than his preexisting relationship with one of the partners – staked a baseless claim on behalf of MLA to the $375,000 placement fee contractually due from the new firm to Plaintiff for the partner's lateral move. This supposed claim willfully ignored that neither MLA nor Mullman had timely presented that partner as a candidate, and moreover that neither had done any work to further the placement.

**ANSWER:**      Denied.

3.      Then, when Jordan refused to capitulate to Mullman's demand that she waive Plaintiff's contractual rights to the fee, Mullman threatened – in a recorded telephone conversation with Jordan – to take *both* candidates to a *different* firm than the one where Plaintiff had presented them, thereby leaving Plaintiff, in Mullman's words, with nothing.

**ANSWER:**      Denied.

4.      Under the terms of Plaintiff's written contract with the hiring law firm – as MLA is (and, at all relevant times, was) aware – only the first search firm to present a candidate is eligible to be paid a placement fee.  Further, the agreement provides that if two search firms stake a claim to the placement fee, the search firms must negotiate between themselves "an agreement as to the percentage (if any) to be paid to each search firm".

**ANSWER:**      Denied except to admit that Plaintiff's written contract with the hiring firm

speaks for itself.

5.      The law firm, having been informed by each of Plaintiff and MLA that they claim the placement fee, has placed the fee in a trust account rather than paying it to Plaintiff, even though Plaintiff is contractually and equitably entitled to the fee based on the terms of its written agreement with the law firm and Jordan's diligence in undertaking to present and further the candidacy of both lateral partners with their knowledge and authorization.

**ANSWER:**      Denied.

6.      By contrast, MLA has no legal or equitable basis to claim the fee; as best can be determined, the sum total of its position is that because the lateral partner belatedly decided that he wanted Mullman (rather than Jordan) to be considered his recruiter, that should supersede Plaintiff's contractual right to receive the fee.

**ANSWER:**      Denied.

7.      This is therefore a textbook case of tortious interference.  MLA knew that Plaintiff has and had a contractual agreement with the law firm entitling Plaintiff to the fee, yet MLA, acting through its agent Mullman and others, wrongfully staked a claim to the fee and, upon information and belief, continues to maintain such claim.  MLA's conduct has thereby deprived Plaintiff of the fee, and Plaintiff has been damaged in the amount of the fee, plus interest, together with costs that it has incurred in attempting to recoup the fee, including legal expenses.

**ANSWER:**      Denied.

8.      Plaintiff thus brings the action seeking (1) a declaratory judgment that it, and not MLA, is entitled to the entire placement fee in question; and (2) damages for tortious interference with contract against MLA.

**ANSWER:**      Denied that Plaintiff is entitled to the relief sought.

## PARTIES

9.      Plaintiff Jordan's Ladder Legal Placements, LLC is a New York limited liability company.  Its principal, non-party Melissa Jordan, is a resident of New York County.  Jordan, an attorney, has worked for nearly ten years as a legal recruiter, specializing in high-end lateral partner placements at major law firms.

**ANSWER:**     MLA admits that Jordan's Ladder Legal Placements, LLC is a New York

limited liability company and that Melissa Jordan is a resident of New York County, but lacks

information or belief sufficient to confirm or deny this allegation and therefore denies it.

10.     Defendant Major, Lindsey & Africa, LLC is, upon information and belief, a Maryland limited liability company with its principal place of business in Maryland.  MLA, which has more than 30 offices worldwide, transacts business on a regular and continual basis in the State of New York, maintaining an office in New York County at 521 Fifth Avenue, 5th Floor, New York, New York  10175.

**ANSWER:**     Admitted.

## RELEVANT NON-PARTIES

11.     Non-party Lawrence N. Mullman is a legal recruiter and a partner in MLA's office in New York, New York.

**ANSWER:**     Admitted.

12.     Non-party Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") is an international law firm with twenty locations worldwide.

**ANSWER:**     Admitted.

13.     Non-party William M. Bosch, Esq., is a partner in Pillsbury's commercial litigation group, based primarily in Washington, D.C.  He joined Pillsbury on or about April 30, 2021.

**ANSWER:**     Admitted.

14.     Non-party James M. Catterson, Esq., is a partner in Pillsbury's commercial litigation group, based primarily in New York, New York.  He joined Pillsbury on or about May 3, 2021.

**ANSWER:**     Admitted.

## JURISDICTION AND VENUE

15.     This Court has original jurisdiction of this civil action pursuant to 28 U.S.C. § 1332(a) (diversity) because Plaintiff and MLA are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

**ANSWER:**     Admitted.

16.     An actual controversy exists between Plaintiff and MLA that is of sufficient immediacy and reality to warrant declaratory relief.

**ANSWER:**     Denied. Declaratory relief is not warranted and the count for declaratory

relief has been dismissed by the Court.

17.     This Court has personal jurisdiction over Defendant MLA pursuant to New York's long-arm statute, CPLR § 302(a)(3), because the facts underlying the Complaint arise out of MLA's alleged actions (and the actions of its agents) in New York state.

**ANSWER:**     Admitted.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, both because one or more parties is a resident of New York County and because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this judicial district.

**ANSWER:**     Admitted.

## STATEMENT OF FACTS

### A.     Plaintiff Identifies Pillsbury as a Lateral Opportunity for Bosch

19.     Jordan organized Plaintiff as a limited liability company on August 15, 2019.

**ANSWER:**     MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

20.     Beginning in or around September 2019, Bosch began to discuss with Jordan possible opportunities for Bosch to make a lateral move away from the firm at which he was a partner at that time.  Bosch also informed Jordan that other members of that firm's litigation group – of which he was the chair – might seek to move to a new firm with him.

**ANSWER:**     MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

21.     Jordan worked diligently on Bosch's behalf to identify suitable firms, particularly those that might be looking to hire partners with Bosch's expertise in commercial litigation and

specialty in real estate litigation.  For instance, relying on her expertise as a legal recruiter, Jordan compiled a detailed spreadsheet and comprehensive analysis of the pros and cons of potential lateral moves to more than three dozen law firms, and she emailed the same to Bosch in January 2020.

**ANSWER:**   MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

22.   Bosch expressed his gratitude for Jordan's efforts and together they identified Pillsbury, in January 2020, as the firm that appeared to be the best fit.  Jordan reached out to Pillsbury to inform them that she had an unnamed candidate to present to the firm.

**ANSWER:**   MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

### B.   Plaintiff's Fee Agreement with Pillsbury

23.   On January 24 2020, Jordan signed Pillsbury's standard Attorney Search Firm Agreement (the "Fee Agreement"), which is annexed to this Complaint as Exhibit A.  The Fee Agreement was executed by Jordan, on behalf of Plaintiff, and by Charles L. Curtis, on behalf of Pillsbury.  The Fee Agreement refers to Plaintiff as "Search Firm" in all relevant paragraphs, and refers to Pillsbury and Search Firm, collectively, as the "Parties".

**ANSWER:**   MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it except to admit that the Fee Agreement speaks for itself.

24.   In relevant part, the Fee Agreement includes the following provisions:

a.   Section 1(b) provides that "If a candidate presented by Search Firm is admitted as a partner of Pillsbury under circumstances that entitle Search Firm to receive compensation pursuant to this Agreement, Pillsbury will pay Search Firm a fee equal to twenty-five percent (25%) of the candidate's annual base compensation or estimated annual base profit participation (whichever is applicable) as of the date the candidate becomes a member of the Firm."

b.   Section 1(d) provides that "If Search Firm refers more than one candidate from the same law firm, agency or other organization as a 'group' or 'package,' the fee shall be the amount equal to twenty-five percent (25%) of the annual base compensation or estimated annual base profit participation (whichever is applicable) of the two (2) most highly compensated attorneys of the group hired."

c.   Section 1(e) provides that "Fees are payable within thirty (30) days of Pillsbury's receipt of invoice from Search Firm."

d.      Section 2 provides that "If Pillsbury receives a candidate's resume from more than one source, the resume which was received first, regardless of which Pillsbury office received the resume, will be deemed to be the first resume received by Pillsbury, and only that source will be eligible for a placement fee (if applicable).  Pillsbury will deem that resume to be the exclusive referral of Search Firm for six months from initial receipt of the resume (or for six months after the candidate's last interview with Pillsbury, whichever is later)."

e.      Section 2 also provides that "Every candidate, including each member of a 'group' or 'package', must have his/her express permission, preferably in writing, to Search Firm to submit his/her resume and any other information to Pillsbury."

f.      Section 2 further provides that "In the event that more than one search firm claims the right to a placement fee for placement of a particular candidate or candidates . . . it will be the obligation of Search Firm to negotiate directly with any other search firm claiming a right to payment of a placement fee and to reach an agreement as to the percentage (if any) to be paid to each search firm, not to exceed in aggregate the placement fees described in paragraph 1 above."

**ANSWER:**    MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it except to admit that the Fee Agreement speaks for itself.

25.    Upon information and belief, the Fee Agreement is a boilerplate document commonly used by Pillsbury in its relationships with legal recruiters.

**ANSWER:**    MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

26.    Upon information and belief, if there exists a fee agreement between Pillsbury and MLA, it would be substantively identical to the Fee Agreement between Pillsbury and Plaintiff.

**ANSWER:**    Admitted that MLA also had a fee agreement with Pillsbury related to

Catterson and that it is substantially similar to the Plaintiff's agreement with Pillsbury.

**C.      Jordan Introduces Bosch to Pillsbury Prior to the Coronavirus Pandemic**

27.    On January 29, 2020, Jordan shared Bosch's name with Pillsbury and informed the firm that because Bosch was in a leadership role he might bring other partners with him if he were to move.

**ANSWER:**    MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

6

28.     On February 5, 2020, Bosch had an initial phone interview with a partner at Pillsbury, and on February 24 and 25, 2020, Bosch interviewed with additional Pillsbury partners.  As is standard in the industry, these interviews were scheduled with Pillsbury by the legal recruiter – *i.e.*, Plaintiff – on behalf of the candidate – *i.e.*, Bosch.  Based on feedback that Jordan obtained, Pillsbury was excited about pursuing the opportunity with Bosch, as was Bosch with Pillsbury.

**ANSWER:**     MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

29.     Shortly thereafter, however, the coronavirus pandemic intervened, and – although Jordan maintained communication with Pillsbury about Bosch throughout the subsequent months – Plaintiff did not have further substantive contact with Pillsbury regarding Bosch's candidacy until December 2020.

**ANSWER:**     MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

**D.     Jordan Presents Both Bosch and Catterson to Pillsbury**

30.     Following the delay occasioned by the coronavirus pandemic, Jordan again engaged with Pillsbury in substantive discussions regarding Bosch's lateral candidacy beginning in December 2020.

**ANSWER:**     MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

31.     To wit, on or about December 16, 2020, Jordan contacted Pillsbury's internal recruiting team in order to facilitate a conversation between Bosch and Deborah Baum, the head of Pillsbury's global litigation practice.  On or about January 5, 2021, Jordan was informed by email that Pillsbury remained interested in Bosch's candidacy.

**ANSWER:**     MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

32.     On or about January 12, 2021, Bosch spoke with Baum.  That same day, Bosch expressed to Jordan that the discussion with Baum had gone well, and informed Jordan that he had broached with Baum the possibility of bringing a colleague along with him to Pillsbury – namely Catterson.  Bosch specifically asked Jordan not to reach out to Catterson until Bosch had confirmed both Catterson's interest in Pillsbury as well as Catterson's willingness to speak with Jordan specifically.

**ANSWER:**   MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

33.    Later that day, Jordan emailed Bosch to request that Bosch pass her contact information to Catterson <u>if and only if</u> Catterson wanted to discuss the Pillsbury opportunity with her.  Importantly, because Jordan did not want to interfere if Catterson was working with another recruiter, and understood that Bosch did not want to interfere either, Jordan – consistent with both Bosch's request and industry custom – did not reach out directly to Catterson.

**ANSWER:**   MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

34.    The following day, Bosch emailed Jordan to inform her of Catterson's availability for a meeting with Pillsbury, which he asked her to arrange.  Jordan understood from this and subsequent communications with Bosch that Catterson had expressly authorized her – rather than another recruiter – to submit information to Pillsbury in support of his candidacy.

**ANSWER:**   MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

35.    On this basis, Jordan proceeded to exchange numerous emails over the next week with Pillsbury and Bosch, through which she arranged an initial meeting between Catterson and Pillsbury, for January 25, 2021, which Bosch was scheduled to join.

**ANSWER:**   MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

36.    During these communications, Pillsbury asked Jordan to pass along confidentiality forms to Catterson.  Jordan forwarded the forms to Bosch, who at the time was acting as an intermediary between herself and Catterson, as attachments to an email dated January 21, 2021.

**ANSWER:**   MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

37.    The following day, *i.e.*, January 22, 2021, Bosch returned the forms – which appeared to have been completed and signed by Catterson – to Jordan, who forwarded them to Pillsbury.

**ANSWER:**   MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

38.     On January 25, 2021, as Jordan had arranged, Bosch and Catterson together met with Pillsbury.  Later that day, Jordan spoke to Bosch, who provided her with feedback on the meeting on behalf of himself and Catterson.  During that call, Bosch indicated that Catterson did not need to speak with Jordan at that time but would reach out if any questions arose.  Bosch specifically confirmed, during the January 25 call with Jordan, that Catterson knew to reach out to Jordan if he had any questions about Pillsbury.

        **ANSWER:**     MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

39.     The following day, *i.e.*, January 26, 2021, Pillsbury sent Jordan Lateral Partner Questionnaire (LPQ) forms for completion by Bosch and Catterson.  Jordan forwarded both forms to Bosch, who, upon information and belief, forwarded the LPQ form to Catterson.

        **ANSWER:**     MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

40.     Jordan understood at this point, on the basis of her communications with Bosch regarding Catterson, both that Catterson was interested in pursuing a move to Pillsbury and was aware of and had approved her representation of his candidacy.

        **ANSWER:**     MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

41.     Furthermore, by communicating with Jordan regarding Catterson, Pillsbury treated Plaintiff as the recruiter of record for Catterson for (at a minimum) the entire period from January 13, 2021 to January 26, 2021, during which time Jordan had (a) arranged an initial interview for Catterson; (b) coordinated Catterson's submission of necessary confidentiality agreements concerning his candidacy; and (c) requested Catterson's submission of the LPQ form.

        **ANSWER:**     MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

42.     At that point, there was <u>no</u> additional work to be done by Plaintiff to present Catterson as a candidate to Pillsbury, as contemplated by Section 2 ("Presentation of Candidates") of the Fee Agreement.  Specifically, according to standard industry practice, for partners of the seniority of Bosch or Catterson (who, prior to having become a law firm partner of Bosch's, was a justice of the Appellate Division of the New York Supreme Court, First Department) to make a lateral move, there is absolutely no need (or expectation) for a search firm to present a candidate's resume, referrals, or other supporting materials, as there would be for a more junior partner or associate candidate.  A partner-level candidate is considered to be presented, and to be exclusively presented by a specific recruiter, when that recruiter gives the

individual's name to the law firm with the individual's authorization.  And, for any candidate –
irrespective of seniority – that candidate would indisputably be deemed to have been presented
once they actually met with the new law firm.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required.

To the extent a response is required, it is denied.

43.    Under the exclusivity provision of Section 2 of the Fee Agreement, "[i]f Pillsbury
receives a candidate's resume from more than one source, the resume which was received first,
regardless of which Pillsbury office received the resume, will be deemed to be the first resume
received by Pillsbury, and <u>only that source will be eligible</u> for a placement fee (if applicable)"
(emphasis added).  Additionally, "Pillsbury will deem that resume to be <u>the exclusive referral of
Search Firm for six months</u> from initial receipt of the resume" (emphasis added).  Accordingly,
only Plaintiff could be eligible to receive the placement fee for Catterson, who began his
employment at Pillsbury less than six months after Plaintiff formally presented him to the firm in
January 2021.

**ANSWER:**    This paragraph states a legal conclusion to which no response is required.

To the extent a response is required, it is denied.

**E.    MLA Tortiously Interferes with Plaintiff's Contract with Pillsbury**

44.    On January 27, 2021, Catterson contacted Jordan by telephone.  During their call,
Catterson informed Jordan that he was represented by Mullman, of MLA.  Jordan responded that
this was inconsistent with the fact that Catterson had already interviewed with Pillsbury, a
meeting that Jordan had coordinated via Bosch with Catterson's permission.

**ANSWER:**    MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it except to admit that Catterson did not wish to be represented by

Jordan.

45.    Later that day, Jordan spoke with Bosch.  During their call, Bosch asked her to
consider splitting the Catterson Placement Fee with MLA.  Jordan explained why the Catterson
Placement Fee was due to her firm, and not to MLA, but said she would consider Bosch's
request as a professional courtesy.  In a subsequent email to Bosch that evening, Jordan offered
to speak to Mullman about the fee.

**ANSWER:**    MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

46.    On January 29, 2021, Pillsbury's Baum contacted Jordan.  In a telephone call,
Baum stated that Pillsbury intended to pay the Catterson Placement Fee to MLA and suggested

that Plaintiff could work out a potential split of the fee with MLA after the fact.  Baum said that Pillsbury would be willing to strongly encourage MLA to split the fee with Plaintiff.  During the call, Jordan communicated to Baum that paying the fee to MLA would directly contravene the terms of the Fee Agreement.  She reiterated to Baum, however, the offer she had previously made to Bosch, *i.e.*, that she would be willing to speak to Mullman concerning the fee that was due to Plaintiff.

> **ANSWER:**   MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

### F.   Mullman Threatens to Leave Plaintiff "With Nothing"

47.   On February 2, 2021, Jordan received a voicemail message from Mullman saying that Baum had asked him to reach out to her.

> **ANSWER:**  MLA lacks information or belief sufficient to confirm or deny this allegation

and therefore denies it except to admit that Mullman contacted Jordan to discuss this issue.

48.   The next day, Jordan spoke with Mullman.  During the telephone call, which Jordan recorded in order to memorialize the conversation:

- Mullman said that he was representing Catterson in connection with the Pillsbury opportunity and demanded 100% of the Catterson Placement Fee on behalf of MLA.

- Jordan responded that this demand was unreasonable and unsupported by the facts, particularly since she had already presented Catterson to Pillsbury as a candidate.

- Jordan maintained that Plaintiff would keep the entire Bosch Placement Fee, as was its right, but that – even though Plaintiff was also entitled to the entirety of the Catterson Placement Fee under its Fee Agreement with Pillsbury – she was willing to engage in a reasonable discussion with Mullman about MLA receiving a portion of the Catterson Placement Fee in the interest of compromise.

- Mullman said that neither he nor Pillsbury would ever permit Plaintiff to keep the entire Bosch Placement Fee while also receiving a portion of the Catterson Placement Fee.  He threatened Jordan that, if she persisted in seeking both fees, Catterson and Bosch "will go elsewhere rather than see that happen and you'll end up with nothing" (emphasis added).

> **ANSWER:**   Admitted that Jordan and Mullman spoke by phone about the Bosch and

Catterson placement fees, that Jordan secretly recorded the phone call without Mullman's

knowledge or consent, and that they disagreed as to which firm was entitled to the Catterson

placement fee.  Denied that Mullman "threatened" Jordan or that the above accurately represents

the entirety of that conversation.

### G.     MLA's Tortious Acts Damage Plaintiff

49.     In or around April 2021, Jordan learned, via a telephone call with Pillsbury, that
Bosch and Catterson would be joining Pillsbury as partners on April 30 and May 3, 2021,
respectively.  She further learned that Pillsbury would be paying a placement fee of $375,000 for
each candidate.

**ANSWER:**     MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

50.     On or about May 3, 2021, Plaintiff submitted to Pillsbury an invoice for $375,000
for the fee for the placement of Bosch and an invoice for $375,000 for the fee for the placement
of Catterson.

**ANSWER:**     MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

51.     As is standard in the legal recruiting business, and consistent with the terms of the
Fee Agreement, Plaintiff's invoices specified that payment of each of the placement fees was due
within 30 days, *i.e.*, by June 2, 2021.

**ANSWER:**     MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

52.     By email dated June 16, 2021, Charles Curtis, on behalf of Pillsbury, informed
counsel for Plaintiff that he had "been authorized to process a payment to [Plaintiff] in the
amount of $375,000 for the placement of Bill Bosch."  Plaintiff received that payment on or
about June 18, 2021.

**ANSWER:**     MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

53.     In the same June 16 email, Curtis further informed counsel for Plaintiff that
Pillsbury would be "holding the fee on James Catterson in a trust account pending notification
from both parties that the dispute between MLA and [Plaintiff] has been resolved."

**ANSWER:**     MLA lacks information or belief sufficient to confirm or deny this

allegation and therefore denies it.

54.     To date, Plaintiff has not received payment of the Catterson Placement Fee.

**ANSWER:**     On information and belief, admitted.

### FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

55.     Plaintiff repeats and realleges Paragraphs 1 through 53, as if set forth fully herein.

**ANSWER:**     This claim has been dismissed and thus no response to this paragraph is

required.  To the extent any response is required, MLA repeats and realleges it responses to

Paragraphs 1 through 53 as if set forth fully herein.

56.     Plaintiff entered into the Fee Agreement with Pillsbury on January 24, 2020.

**ANSWER:**     This claim has been dismissed and thus no response to this paragraph is

required.  To the extent any response is required, it is denied.

57.     In compliance with all applicable terms of the Fee Agreement, Plaintiff thereafter
presented Catterson as a candidate to Pillsbury.

**ANSWER:**     This claim has been dismissed and thus no response to this paragraph is

required.  To the extent any response is required, it is denied.

58.     Catterson provided his express permission to Plaintiff to submit him as a
candidate to Pillsbury through acts that included – directly or through Bosch – agreeing to have
Plaintiff arrange an interview for him; providing his availability to Plaintiff for said interview;
providing his completed confidentiality form to Plaintiff; and, ultimately, attending the interview
with Pillsbury that Plaintiff had arranged.

**ANSWER:**     This claim has been dismissed and thus no response to this paragraph is

required.  To the extent any response is required, it is denied.

59.     Plaintiff, and not MLA, was the first firm to present Catterson to Pillsbury as a
candidate.

**ANSWER:**    This claim has been dismissed and thus no response to this paragraph is required.  To the extent any response is required, it is denied.

60.    Pursuant to the Fee Agreement, Plaintiff, and not MLA, is therefore entitled to receive the entirety of the Catterson Placement Fee.

**ANSWER:**    This claim has been dismissed and thus no response to this paragraph is required.  To the extent any response is required, it is denied.

61.    Upon information and belief, Pillsbury has placed the Catterson Placement Fee in trust pending notification from both parties that the dispute between MLA and Plaintiff has been resolved.

**ANSWER:**    This claim has been dismissed and thus no response to this paragraph is required.  To the extent any response is required, it is denied.

62.    As a result of the facts described in the foregoing paragraphs, this Court is presented with a substantial controversy of sufficient immediacy and reality to warrant the exercise of its equitable powers.

**ANSWER:**    This claim has been dismissed and thus no response to this paragraph is required.  To the extent any response is required, it is denied.

**SECOND CLAIM FOR RELIEF**
**(Tortious Interference with Contract)**

63.    Plaintiff repeats and realleges Paragraphs 1 through 61, as if fully set forth herein.

**ANSWER:**    MLA repeats and realleges its responses to Paragraphs 1 through 61 as if set forth fully herein.

64.    Plaintiff entered into the Fee Agreement with Pillsbury on January 24, 2020.  The Fee Agreement was at all relevant times and remains a valid, binding, and enforceable contract.

**ANSWER:**    MLA lacks information or belief to confirm or deny the first sentence in this paragraph and therefore denies it except to admit that the Fee Agreement speaks for itself. The second sentence in this paragraph contains a legal argument to which no response is

required.  To the extent a response is required, MLA lacks information or belief sufficient to

confirm the second sentence and therefore denies it.

65.     Although the Fee Agreement is generally terminable at-will by either party upon ten days' prior written notice, neither Plaintiff nor Pillsbury has terminated (nor given notice of its intention to terminate) the agreement.  Even if the Fee Agreement were to have been terminated, by its terms, "any placement activity which is in process or has been completed at the time of termination" would remain subject to the Fee Agreement.

**ANSWER:**     MLA lacks information or belief sufficient to confirm or deny this

paragraph and therefore denies

66.     At all relevant times, MLA was aware of the existence of the Fee Agreement.

**ANSWER:**     Denied.

67.     Beginning on or about January 27, 2021, MLA intentionally and improperly facilitated Pillsbury's breach of the Fee Agreement by staking a knowingly baseless claim to the Catterson Placement Fee with Pillsbury.  At all relevant times, MLA acted through its agent, Mullman, who was acting on MLA's behalf within the scope of his employment.

**ANSWER:**     MLA denies this paragraph except to admit that Mr. Mullman is an

employee of MLA.

68.     MLA's conduct was without justification and improper.

**ANSWER:**     Denied.

69.     The breach of the Fee Agreement would not have occurred but for MLA's activities, in that Pillsbury put the Catterson Placement Fee in trust – rather than paying it to Plaintiff on or before June 2, 2021, as contractually required – solely due to MLA's baseless claim to the fee.

**ANSWER:**     Denied.

70.     Due to MLA's tortious interference, Plaintiff has directly and proximately suffered damages, the amount of such damages to be proven at trial.

**ANSWER:**     Denied.

71.     As a result of MLA's inducement of Pillsbury to breach, as set out in Paragraphs 49, 52, and 53, Plaintiff has suffered damages in the amount of $375,000 (exclusive of interest and costs) in that Pillsbury failed to make payment of the Catterson Placement Fee to Plaintiff on or before June 2, 2021 as contractually required.

**ANSWER:**    Denied.

72.    The damages flow directly from, and are the natural and probable consequences of, MLA's inducement of Pillsbury's breach of contract.

**ANSWER:**    Denied.

73.    MLA's misconduct evinces such a high degree of moral culpability as to warrant punitive damages.  Plaintiff is entitled to punitive damages against MLA in an amount to be determined at trial.

**ANSWER:**    Denied.

74.    Plaintiff is entitled to interest on the foregoing sums plus the costs of this action, including legal fees.

**ANSWER:**    Denied.

WHEREFORE, it is respectfully requested that judgment be entered for Plaintiff, awarding it:

(a)    on Plaintiff's First Claim for Relief seeking a Declaratory Judgment, a declaration that Plaintiff, and not MLA, is entitled to the entirety of the Catterson Placement Fee;

(b)    on Plaintiff's Second Claim for Relief for Tortious Interference with Contract, an award of monetary damages in an amount to be determined at trial, but in any event no less than $375,000; and an award of attorneys' fees and punitive damages;

(c)    an award of such interest as is allowed by law (including pre-judgment and post-judgment interest);

(d)    an award of reasonable attorneys' fees and costs; and

(e)    such other relief as the Court deems reasonable and proper.

**ANSWER:**    MLA denies that Plaintiff is entitled to the relief it seeks.

## AFFIRMATIVE AND OTHER DEFENSES

## FIRST DEFENSE

Plaintiff's claim for tortious interference fails because the purported agreement between

Jordan's Ladder and Pillsbury is not a valid and enforceable agreement with respect to Catterson.

## SECOND DEFENSE

Plaintiff's claim for tortious interference fails because MLA lacked actual knowledge of the existence of the Fee Agreement.

## THIRD DEFENSE

Plaintiff's claim for tortious interference fails because MLA acted with justification and with a legitimate business purpose in its own economic interest, including as a competitor to Jordan's Ladder with its own contract with Pillsbury, and did not act with malice.

## FOURTH DEFENSE

Plaintiff's s claim for tortious interference with contract fails because MLA did not intentionally induce any third party to breach any alleged agreement with Plaintiff.

## FIFTH DEFENSE

The damages claimed by Plaintiff, if any, resulted from either independent, intervening, or superseding cause or causes, and no action or omission on the part of MLA was the proximate or contributing cause of Plaintiff's alleged injuries.

## SIXTH DEFENSE

Plaintiff has suffered no damages as a result of MLA's alleged conduct.

## SEVENTH DEFENSE

Plaintiff's Complaint fails to state facts sufficient to entitle Plaintiff to an award of punitive damages.

## EIGHTH DEFENSE

MLA reserves the right to amend its pleading to assert such additional defenses as may arise during the course of discovery in this matter.

WHEREFORE, MLA respectfully requests judgment in its favor and against Plaintiff along with costs and all other relief that this Court deems just and proper.  MLA reserves its right to move for an award of counsel fees, costs, sanctions, and other relief that may be warranted.

Dated:  May 25, 2022 SHOOK, HARDY & BACON L.L.P.

By:

William E. Vita, Esq.
1325 Avenue of the Americas, 28th Floor
New York, NY  10019
(212) 989-8844
(929) 501-5455 (fax)
wvita@shb.com

*Attorneys for Defendant*
*Major, Lindsey & Africa, LLC*